402 A.2d 1037

**In re Paul KUNKLE, a Juvenile, Edward Kunkle, a Juvenile.**

**Appeal of Charles H. KUNKLE and Janice G. Kunkle.**

Superior Court of Pennsylvania.

Submitted March 29, 1978.

Decided May 4, 1979.

606

John B. Dunn, Allentown, for appellants.

Malcolm J. Gross, Allentown, for appellee, Lehigh County Children's Bureau.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

HESTER, Judge:

This is an appeal from an order of the Common Pleas Court of Lehigh County adjudicating Paul and Edward Kunkle deprived; removing them from their home; and giving custody to the Lehigh County Children's Bureau.

The appellants, Charles H. and Janice G. Kunkle, are the natural parents of the above named juveniles. This present action was initiated on April 12, 1977 by a Deprivation Petition filed by the Lehigh County Children's Bureau.

The Deprivation Hearing was held on May 16, 1977, and on May 25, 1977, the court adjudicated Paul and Edward Kunkle deprived and placed them in custody of the Lehigh County Children's Bureau. This appeal followed.

Appellants' first contention is that the evidence presented below was insufficient to sustain a finding of deprivation within the meaning of the Juvenile Act, December 6, 1972, P.L. 1464 # 333, § 1, 11 P.S. § 50–101, et seq.

In order to adjudicate Paul and Edward Kunkle "deprived", the hearing judge had to find from "clear and convincing" evidence that the children were "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [their] physical, mental or emotional health or morals." The Juvenile Act, supra, at § 50–320(c), § 50–102(4)(i).

In reviewing the disposition below, we must always give great weight to the operation of the trial court, who has had an opportunity to observe and hear witnesses and thus judge credibility; in addition, talking to the children involved. *Clair Appeal*, 219 Pa.Super. 436, 281 A.2d 726 (1971). But, granting that we cannot substitute ourselves as fact finder in place of the hearing judge, we are not bound by a finding which has no competent evidence to support it. *Commonwealth ex rel. Morales v. Morales*, 222 Pa.Super. 373, 294 A.2d 782 (1972).

A review of the record indicates that there was more than sufficient credible evidence to sustain the finding that the Kunkle children were "deprived". In support of his adjudication, the court initially stated:

The presence of innumerable animals and their accompanying odors, the constant smell of urine and the stench arising from open garbage all over the kitchen and floor caused Allentown Police Juvenile Officer Joan Hausman

and others to characterize this home a health hazard. The apartment is also cluttered and disarrayed by the presence of clothing, dirty pots and dishes and open food. A general absence of scrubbing, vacuuming and cleaning inure to the detriment of the occupants. (Lower Court Opinion, pages 2 and 3)

The Kunkles were no strangers to the Lehigh County Children's Bureau. Two of their older children had been removed from the home prior to this proceeding. Dianne Avila was the case worker assigned to work with the Kunkles since January, 1977. She went to the Kunkle apartment on April 20, April 22 and April 25, 1977. Her function was to pick up an older daughter, Geraldine, and remove her for placement in other surroundings. She testified that the home was in a deplorable condition; dishes, clothing, garbage all over the place plus a terrible odor (T. 4, 5). She further stated:

Q And you are saying you could smell it from the first floor?

A Yes.

Q All right. What happened then?

A I went up to the apartment and Mrs. Kunkle was out on the balcony and I asked if we could go inside and she said yes, and we went in through the kitchen. The kitchen was in complete disarray. It appeared as if every dish and pot and pan had been used and had just been left. There was no attempt to wash the dishes or clean up the aftermath of the meal preparation for quite a few days. It was just piled up everywhere and there were bags of garbage sitting around; pots; dirty pots sitting on the stove. They appeared to have been sitting there—

Q Was this true of the kitchen or were there any other rooms—did you look at the bedrooms in the apartment, for instance?

A Yes. I looked at the entire apartment.

Q What were the bedrooms like? Will you tell us about that?

A  Well, there was clutter throughout the entire apartment; clothing strewn everywhere. Mrs. Kunkle was in the process of cleaning out one closet in one bedroom and that may have accounted for some of the clutter in that particular bedroom. There was a urine odor coming from the bedrooms and also a urine odor coming from the bathroom. (T. 7)

Q  All right. And you say that was from the bathrooms and bedrooms.

A  Right. It smelled as if perhaps someone had been wetting the bed and the bed was soaked with urine. I think that's where the odor was coming from.

Q  Did you observe that, too, that the bed was soaked?

A  No, I did not observe that.

Q  You smelled it.

A  Yes.

Q  All right. What about clothing? Did you see any clothing around?

A  The clothing was just sort of strewn around. There was a nail between the living room and dining room where some of the clothing was hung up. The apartment was just totally wrecked from my observation. (T. 8)

Mrs. Avila returned on April 29, 1977 and found the odor still bad; the kitchen cleaned up; things put away; fairly neat but there had been no scrubbing and a vacuum had not been used. The place really was not clean (T. 9). On May 11th, the odor was still present (T. 10). Avila returned May 11th after she had encouraged the Kunkles to get their dwelling "really cleaned up" for the case worker to make her final observation of the living conditions prior to the hearing in the court below (T. 11). She found that the conditions had deteriorated.

Susan Hackman, case worker for the Lehigh County Children's Bureau, visited the Kunkle home on seven occasions during March, 1977. She was the case worker for the Eltz family. Two of the Eltz boys were regularly truant from school and they usually went to the Kunkle home in spite of

many admonitions delivered to Mrs. Kunkle not to permit them entry. She also stated the kitchen was usually "pretty dirty"; the rest of the house was "cluttered" and on every occasion there was a very distinct odor (T. 26). In addition she testified as follows:

Q What was Mrs. Kunkle's condition when you visited the home?

A One time in particular, Mrs. Kunkle was drinking and—

Q What time of the day was that?

A This was approximately 2:00 o'clock in the afternoon. Jimmy had run away from his foster home and I went there to find him and he had just run out the back door. Later I was over at the Eltz home and Mrs. Kunkle was down the street next to the Eltz apartment with her daughter and at that point she looked to me to be inebriated.

Q Why do you say that? What's the basis for your opinion on that?

A Well, she was still drinking.

Q What do you mean she was drinking, Mrs. Hackman?

A Okay. She was drinking from a quart bottle of beer.

Q Yes. With a glass or just—

A No, just from a bottle.

Q In the street?

A It was in an alleyway between the apartments and this was two hours after I had seen her drinking in her home.

Q What was she drinking on that occasion the two hours before?

A Beer.

Q Again, out of the bottle?

A I don't specifically recall whether it was out of the bottle or not.

Q What else was she doing that made you form the opinion she was inebriated?

A She was laughing. Her face was very flushed and she was slurring words. (T. 26, 27)

Joan Hausman, a Juvenile Officer with the Allentown Police Department, testified that she had been called by the apartment manager in March, 1977, complaining about the Kunkle apartment. The Eltz children were in the apartment again. The witness stated:

"Geraldine and Franklin and Eddie were not in school that day. I read the Riot Act to Mrs. Kunkle. She seemed to be unconcerned about the fact that the children were truant from school and I warned her about harboring the Eltz's children in the apartment, and allowing them while they were there from school that day—" (T. 30)

Officer Hausman returned to the Kunkle apartment on April 12, 1977, again in search of the Eltz boys. Again she located them there. She observed the kitchen and when requested to describe it, she responded:

"Garbage all over the kitchen floor. James had to wade through it to get into the apartment to get Dale. There was silver, a stack of silver, silverware, eating utensils that had not been washed, unwashed dishes and it was about that high (indicating). That's the only way I can describe it.

Q You're describing what, about a foot high and two feet long?

A Yes, that much.

Q Stacked up, table ware?

A Right, and there was—

Q And that was all unwashed and dirty?

A Oh, yes, it was a mess.

Q Where was that?

A In the kitchen sink, at the kitchen sink.

Q What else did you observe in the kitchen that day? You said, you mean you had difficulty walking in that kitchen?

A I wouldn't even go in.

Q But you could see that people couldn't even walk through it.

A  I stood right at the door. James had to wade through it to get in to get Dale out.

Q  Was there open garbage there?

A  Yes.

Q  On the floor.

A  Yes. (T. 32, 33)

On April 12, 1977, the police picked up Paul and Franklin Kunkle; they were under the influence of glue sniffing and were returned to their home (T. 32).

The school records disclosed that for Paul Kunkle in the 1976–1977 school year, he had been absent 14 days out of 160 days; four absences were excused. For Edward, he was absent 23 days out of 160; 11 absences were excused.

Rosie Ann Good and Mary Ann Hall, the school teachers of Paul and Edward, testified that the boys did have a peculiar odor about them and were poorly dressed and were physically dirty. These matters were discussed with the mother and the boys. Some improvement was noted for a short time thereafter but the conditions soon reappeared. Their shirts were visibly dirty, the pants were soiled but the most distinct thing in the mind of one teacher was the odor (T. 21). Edward's teacher described him as: "physically he is not a very well kept young man." (T. 22). Both boys were described as very good students. There was also testimony that the children were not receiving adequate medical and dental attention and treatment.

During an interview with the court, the boys testified that they have a cupcake for breakfast, no milk, no lunch (T. 49–51); that Paul shines shoes in many of the bar rooms in the area of his home; generally from 5:00 to 8:00 P.M. daily. He earns approximately $50 per week, one-half of which he gives to his mother (T. 57).

The Kunkles did not testify, nor did they introduce any testimony in their behalf.

At the conclusion of the testimony, the court suggested that counsel and the court pay an immediate visit to the Kunkle residence. Permission was refused by the Kunkles.

The court below had appointed Patricia A. Armstrong, Esquire, as Guardian ad litem for Paul and Edward Kunkle. Her recommendation to the court was:

"I would like to comment that I feel that both children have lived under relatively adverse conditions and perhaps the biggest being a total lack of parental care up until this time. I will admit they have survived very well but I do not feel it is the responsibility of an eight year old and an eleven year old to take care of their own clothing, to give themselves the entire aura of parental care that should be coming from their parents and, at such time that the parents can prove that they can afford these two youngsters this control, which would include the maintenance of the home, that I would have no objection to them being in the household at that time, but right now they receive absolutely no guidance or control within their home situation." (T. 36–37).

In *Interest of LaRue,* 244 Pa.Super. 218, 231, 366 A.2d 1271, 1277 (1976), this court stated:

"It is not to preserve a mere social form, or a convention from the past, but to provide our children a place of shelter and love, so that they may grow in freedom and strength. The measure of a family's vitality is its ability to perform this function."

The hearing court correctly evaluated this situation as follows:

Our province is to determine whether there is clear and convincing evidence that these children are deprived and, if so, whether it is necessary to separate them from their parents. *Interest of LaRue,* supra.

"[S]tate interference with a parent-child relationship is a most serious intrusion . . . such an intrusion is properly tolerated only in cases in which the Commonwealth sustains a very strict burden of proof. On the other hand, the state certainly has an interest in seeing that minimal standards of care are maintained for the children of this Commonwealth." *Matter of DeSavage,* 241 Pa.Super. 174, 183, 360 A.2d 237, 241 (1976).

Parents owe some duty to their children, yet Edward and Paul received virtually no parental care or supervision and their existence is within a structure formed by themselves. The Children's Bureau has repeatedly attempted to assist this family to no avail. The effect of this void which was seen in Geraldine and Franklin has visited itself on Paul and Edward. We need not wait until their heads are submerged before rescue efforts are employed. See: *Id.* and *In re Clouse*, 244 Pa.Super. 396, 368 A.2d 780 (1976). We are desirous of trying to preserve the family unit wherever it retains sufficient vitality.

However, the only vitality displayed in these hearings was that of two endearing juveniles who reached out for parental care, security and guidance and find a vacuum. The Kunkles promises have been empty, yet their children's lives need not be. To return these youngsters to their parents at this time would represent a great disservice to them.

The allegations that these children are deprived having been substantiated by clear and convincing evidence by representatives of the School District of the City of Allentown, the police, the Children's Bureau and the court appointed guardian ad litem for the children and it being obvious that the parents are currently unwilling or unable to parent these children, we concluded that Paul Kunkle and Edward Kunkle are without proper parental care or control, subsistence and education as required by law or other care or control necessary for their physical, mental or emotional health or morals and that it was and is necessary to separate and remove them from their parents and place them in foster care. (Opinion, pages 7 and 8).

The record more than substantiates both the evaluation and conclusion.

Appellants have raised and argue for additional grounds in support of reversal. They are devoid of merit.

We affirm.

SPAETH, J., files a concurring and dissenting opinion.

JACOBS, former President Judge, and HOFFMAN, J., did not participate in the consideration or decision of this case.

SPAETH, Judge, concurring and dissenting:

I concur with the majority's opinion to the extent that it upholds the hearing judge's decision that Paul and Edward are dependent children, I believe, however, that we should remand for further hearing.

–1–

In reflecting upon this case—which, like so many child custody cases, is both heartbreaking and difficult—I have been considerably helped by two notable reports regarding child placement practices.

The first study is by the Children's Defense Fund.[1] After examining child placement in seven states, the Defense Fund summarizes its findings under the heading, "Families Don't Count", and goes on to say:

At every point in the placement process children and their natural families are isolated from one another by the action and inaction of those with official responsibility. Pro-family rhetoric notwithstanding, a pervasive, implicit anti-family bias often shapes decisions about children at risk of removal or in out-of-home care.[2]

Pennsylvania is not one of the states included in the Defense Fund report.[3] However, child placement in Pennsylvania has been studied by the Pennsylvania State Task Force on Foster Care Services, and in its report, released in

1. Children's Defense Fund, Children Without Homes: An Examination of Public Responsibility to Children in Out-of-Home Care (1978).

2. *Id.* at 5.

3. The states included in the Defense Fund study were Arizona, California, Massachusetts, New Jersey, Ohio, South Carolina, and South Dakota.

June 1978,[4] the Task Force makes findings substantially the same as those of the Defense Fund.

Stated generally, the conclusion reached by both the Defense Fund and the Task Force is that before a child is taken from the family, every effort should be made to find and to use services that will enable the child to remain within the family.

The Defense Fund report states:

Theoretically, it is not difficult to imagine a range of services to prevent removal and enable families under stress to continue to function as family units. A poor family about to be evicted might need temporary shelter, money to prevent eviction, or a lawyer to challenge the eviction. A mother with a history of psychiatric illness, overwhelmed by the demands of a new baby, might need day care for her four-year-old or a homemaker to give her some afternoons of relief and prevent her rehospitalization. Day care, day treatment programs, adequate housing, legal services, homemakers, and family shelters are all part of what might be considered supportive family services. So too are parent education programs and respite facilities so parents of severely handicapped children may have some time off. Yet, in most communities few, if any, of these alternatives exist.

*Id.* at 16 (footnote omitted).

And in those communities where such alternatives do exist, they often are not used:

[T]he fact is, it is often easier to place a child than to offer services to him and the family while the child remains at home, regardless of the consequences.

*Id.* at 18.

Nor is official laziness the only explanation of why available alternative services are often not used:

Children are also separated from their own families because someone in authority dislikes the lifestyle or child-

4. Pennsylvania State Task Force on Foster Care Services, Summary Report (1978).

rearing practices of a particular family. Influenced by moral beliefs, political ideologies, or child-saving fantasies, those with decision-making responsibility sometimes fail to consider the psychological consequences to a child of removal from his family.

*Id.* at 18 (footnote omitted).

Where, however, there is resort to alternative services,

[t]he evidence suggests that maintaining children in their own families pays off not only for children, but fiscally as well. Yet it happens too rarely. The roots of the neglect of services to children in their own homes are complex, anchored in biases against the poor and the nearly poor, conveyed in historical patterns of service delivery, and reinforced by current fiscal patterns. The result is that at the point out-of-home placement becomes a serious possibility, it is very likely to become a reality. This is not necessarily what either the parents, the children or the service providers want. It is certainly not what is conveyed in the theory and rhetoric of children's service systems which regard placement of a child out of his own home as "a last resort."

*Id.* at 17–18 (footnotes omitted).

To ensure that in fact a child is not taken from the family except as a last resort, the Task Force has formulated a number of specific recommendations. The first three of these are as follows:

1. The needs of the child should be given primary consideration in any action or decision affecting the child's right to a stable family relationship. Law, regulation and agency procedure should seek to insure that an acceptable environment exists which will provide an opportunity for adequate growth and development for each child. This can most appropriately occur within the child's natural family. Intervention which disrupts the established relationship of child to natural family should occur only where extraordinary circumstances exist.

.    .    .    .    .

2. The child in any contested placement should have full party status and the right to be represented by counsel. Only in this way can the privacy [sic] of the child's best interest be insured in contested court proceedings. Assuming the child has reached the age of understanding the child's right to party status should also include the right to participate in the daily decisions affecting his life such as the selection of a foster home, the movement from one foster home to another, the development and involvement in a placement plan, arrangements for family visitation, and involvement in post planning when foster family care is discontinued.

. . . . .

3. Parental conduct should justify state intervention only when it has clearly negative child's development. Standards for court intervention regarding agency custody and termination of parental rights actions should focus on the emotional and physical needs of the child rather than on parental fault alone. This focus should enhance family autonomy by reducing the number of families brought before the court.

Task Force Report, *supra* at 7–9.

The findings and recommendations of the Defense Fund and Task Force are consistent with our cases. We have repeatedly stated that the needs of the child should be given greatest consideration. *In re Adoption of R. I.*, 468 Pa. 287, 361 A.2d 294 (1976); *Appeal of Diane B.*, 456 Pa. 429, 321 A.2d 618 (1974); *In re Clouse*, 244 Pa.Super. 396, 368 A.2d 780 (1976) (plurality opinion). At the same time we have emphasized that in deciding how best to serve the needs of the child, the hearing judge should make every reasonable effort to preserve the family, only taking the child from the family on proof of "clear necessity", which proof, moreover, must itself be "clear and convincing". *In re LaRue*, 244 Pa.Super. 218, 366 A.2d 1271 (1976); 11 P.S. § 50–101(b) (Supp.1978–79). *See also In re Adoption of R. I., supra; In re DeSavage*, 241 Pa.Super. 174, 360 A.2d 237 (1976); *Stapleton v. Dauphin County Child Care Service*, 228 Pa.Super.

371, 324 A.2d 562 (1974). "It is a serious matter for the long arm of the state to reach into a home and snatch a child from its mother." *Rinker Appeal*, 180 Pa.Super. 143, 148, 117 A.2d 780, 783 (1955). Because it *is* so serious a matter, we have required the hearing judge to inform himself fully; he may not rely on the parties' presentations but has an affirmative duty to seek out evidence from objective, disinterested witnesses; also, he must file a comprehensive and detailed explanation of his order. *In re LaRue, supra; Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976); *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 312 A.2d 58 (1973). And finally, we have recognized the child's own interest and consequent right to be represented by counsel. *In re LaRue, supra; Stapleton v. Dauphin County Child Care Service, supra.*

However, in one respect the Defense Fund and Task Force go beyond our cases. As the Task Force's recommendations show, they state explicitly that even if a hearing judge concludes that a child is without proper parental care, still, the judge should not take the child from the family without first, and further, determining that there are no alternative services that will enable the child to remain within the family. Our cases plainly imply that this is the hearing judge's duty, but they do not say so explicitly. *See, e. g., In re Whittle*, 263 Pa.Super. 312, 397 A.2d 1225 (1979).

In my opinion, we should now say so explicitly. In doing so, we should be following the lead not only of our own cases but of the legislature, which, in providing for the dispositions that a hearing judge may make of a dependent child, has listed as the first—and therefore, we may assume, the preferred—disposition, that "[the court may] [p]ermit the child to remain with his parents  .   . , subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child." Juvenile Act, Act of Dec. 6, 1972, P.L. 1464, No. 333, as amended, 11 P.S. § 50–321(a)(1) (Supp.1978–79). In addition, such an explicit statement of the hearing judge's duty should help improve alternative services, and lead to their

creation where they do not now exist. *Cf. Janet D. v. Carros*, 240 Pa.Super. 291, 362 A.2d 1060 (1976).

–2–

If one applies the foregoing principles to the present case, one will conclude, I believe, that the record should be remanded for further proceedings. The order of remand would not disturb the hearing judge's finding that Paul and Edward were without proper parental care. However, it would instruct the judge to inquire further as to whether it might not be better to leave Paul and Edward with their parents, subject to such conditions as the judge found appropriate with respect to the provision of services designed to strengthen the family. I submit that an examination of the record will support the desirability of such a remand.

The first witness was Diana Avila. Ms. Avila described the Kunkle apartment as having "a horrible odor." N.T. 4. She also described the apartment as being in a mess, when she visited it on April 25th. N.T. 6–7. However, she acknowledged that on April 20th the apartment "was fairly neat", N.T. 4; on April 29th, "fairly neat looking", N.T. 9; and on May 11th, "fairly neat at that point but the odor was still there and the cats were still there", N.T. 10. On her last visit (the date of which the record does not disclose), "it wasn't quite as clean as it had been the two previous visits." N.T. 11.

Ms. Avila also referred to the children's health. In particular, she said that Paul's "feet seemed to be turning in more than they had in the past." N.T. 13–14. At no point, however, did she suggest that parental neglect had affected the children's health. To the contrary, she said "[O]ther than that [Paul's feet], both children appeared to be in good health." N.T. 12–13. On cross-examination the following occurred:

Q. Have the Kunkles cooperated so far with you in getting care for the children for these two children, getting medical attention?

A. Well, yes, I would say that they've shown some cooperation, yeah. Mrs. Kunkle came into the agency one day and we sat down and called until we could find a dentist that would be willing to accept medical assistance. I had encouraged her to do that and they don't have a phone so we worked it out together.

Q. You did work it out. With respect to Paul and Edward, in comparison to Geraldine and Franklin, we were here before on Geraldine and Franklin; how do you view the progress, the school progress, health progress, any other progress that you've been monitering as far as Paul and Edward are concerned?

A. How do I view that? I think that Paul and Edward are doing very well in school. I've talked with both their teachers and health-wise, I think that the club foot condition is something that we're still concerned about and the need for the work on Paul, but health-wise I think the boys are basically healthy.

N.T. 14–15.

The next witness was Raymond Flood, attendance officer of the Allentown School District. He said that for the school term 1975–76, Paul had been absent 7 of 174 days, and Edward, 15, and that for the term 1976–77, Paul had been absent 14 of 160 days, and Edward, 23. N.T. 16. This testimony proved nothing, except that the children were absent a good deal less often than many children are.

The next witness was Rosie Ann Good, Paul's home-room teacher. She said that sometimes when Paul came to school he was dirty, but other times he was "nice and neat but lately his condition is soiled." N.T. 18. She was then asked, "What kind of a student is Paul?", and she replied:

He's a good student. He is on his ability for his age. He is doing a good job and he is a very likeable boy. He has a good attitude about himself. He seems to have a lot on the ball and he understands things around him that are happening and he can talk about them logically, and in his mind he seems very rational about it. Now, I don't know if it's his head or his heart talking but he does seem to

really be able to relate to it and understand what's going on.

·N.T. 18.

The hearing judge then asked, "Do you have parent-teacher conferences?", and she replied:

Yes, and she [Mrs. Kunkle] did come on both occasions and we sat down together and discussed Paul's academic progress and things like this and we also discussed Jimmy [since placed in foster care] and the family, the eldest of the Kunkles and we did relate things about it—nothing that would be, you know, anything more than hearsay. There was trouble there and we had talked about Paul being careful with Jimmy because Jimmy was, I thought, leading Paul into things he shouldn't have been involved with at his age. She was concerned. She came in on both occasions and she seemed really concerned about her child's welfare.

N.T. 19.

The next witness was Mary Ann Hall, Edward's homeroom teacher. Apart from identifying herself, Ms. Hall's entire direct examination was as follows:

Q. Can you describe what Edward's condition has been since he has attended school, physically, this year?

A. Physically he is not a very well kept young man, coming to school with very, very dirty hands, and bodywise, he is not too clean, but I have not detected any odor from him throughout the course of the year, although his clothes are not very well kept. I have not detected any body odor.

Q. But you have detected dirty clothes and dirty hands. Is that right?

A. Yes.

Q. Do you know whether Edward had a problem with head lice during the course of the year?

A. Yes. Edward was sent home after he had been checked by the nurse and the whole room had been checked.

Q. How long did that problem go on?

A. I think it was immediately taken care of and within a day or two he came back to school.

Q. How is Edward doing in school?

A. Edward does excellent work at school and he tries very hard. In fact, he is in my top reading group in third grade.

N.T. 21–22.

On cross-examination she said that except for the one lice incident, Edward had not been sent home. N.T. 23. She then responded to the hearing judge's questions, as follows:

THE COURT: Mrs. Hall, with respect to Edward in the class, I gather he is—you have described him as an excellent student.

A. He is a very, very good student. I mean he has his days like we all have that he isn't working up to par, but he gets along well with the boys and girls. When he came to third grade, third grade was a new experience at a new school for him. He had no friends and it was very difficult for him to get adjusted, and I started setting up little teams of people to have him get adjusted to our school and get adjusted to the boys and girls and he accepted that beautifully and at times he doesn't want to be with other children, but that happens to everyone.

THE COURT: Do you have parent-teacher conferences?

A. I have parent-teacher conferences and she came both times and we discussed his progress. We discussed the fact that at times he has problems of not wanting to work and these are just normal things that children do do in third grade, but his progress has really been just excellent this year and he gets along well with the rest of the class, and the rest of the class always want Eddie for a partner.

N.T. 23.

There were two other witnesses, but they added nothing of substance, and in fact, rather confused the issues with irrelevancies. Susan Hackman, a caseworker for Lehigh County Children's Bureau, mostly spoke of the Eltz family,

to which she was assigned, and Jimmy Kunkle; she acknowledged that she had not been in the Kunkle apartment since March 31st, and had had no direct dealings with Paul and Edward, beyond observing them in the Eltz home. N.T. 28. It is she who saw Mrs. Kunkle "drinking from a quart bottle of beer." N.T. 27. Joan Hausman is a juvenile officer of the Allentown Police Department. She told of finding the Eltz children—who unlike Paul and Edward, were truants—in the Kunkle apartment, which she said was a "health hazard", and of Paul being involved in a glue sniffing incident. N.T. 30–32. However, another officer had investigated the glue sniffing incident, N.T. 32, and after consulting her notes, Mrs. Hausman referred to "the glue sniffing complaint involving Franklin", not Paul, N.T. 35. She then acknowledged on cross-examination that she had no present knowledge that Paul had been involved in glue-sniffing. N.T. 36.

The foregoing is a summary of the evidence presented by the Children's Bureau. It is much to be regretted that the parents were not called to testify, either by the Bureau, their own counsel, or the hearing judge. Taking the record before us, however, as it is, I say that it cannot be held sufficient to support an order taking Paul and Edward from the family. Their house is dirty, and often, so are they; and they have some friends who are bad boys. Surely, however, this might be said of many poor people—and of many who are not poor. We cannot have the state's long arm reaching into homes and snatching away the children on no greater proof than this. In addition, it is most important to consider in the balance the evidence that Paul and Edward are in sound health and doing well—very well—at school.

Finally, there should also be considered the evidence of the boys' interview with the hearing judge. Paul, as the older boy, did most of the talking. After reading the transcript, I came away admiring both boys. Granted that the care given them by their parents has left much to be desired; they've risen above their difficulties in a remarkable way. Especially do I take off my hat to Paul, who "[i]f

it's a good week", makes "close to $50" shining shoes, and then gives half of it to his mother.  N.T. 56–57.

I should reverse and remand for proceedings consistent with this opinion.