414 A.2d 1063

**In the Matter of Leonna GEORGE, Lisa George, Hollie George, Bobby George, alleged to be dependent children.**

**Appeal of: Judith GEORGE.**

Superior Court of Pennsylvania.

Argued March 20, 1979.

Filed Nov. 16, 1979.

Walter Perry, Williamsport, for appellant.

Charles F. Greevy, III, Williamsport, for appellees.

Before PRICE, SPAETH and LIPEZ, JJ.

LIPEZ, Judge:

This is an appeal by a mother from an order declaring her four children dependent children. The order provides that three of the children, Leonna, Lisa, and Hollie, may remain in their mother's custody, subject to "protective supervision" by the Lycoming County Children's Services Agency for the period of one year, but directs that the fourth child, Bobby, be placed in the agency's custody for placement in an approved foster home.

■ One cannot read this record without concluding that Judge Raup was acutely sensitive to the needs of these children and was anxious to meet their needs. However, the legislature long ago decided that the purpose of the "Juvenile Act" was "to preserve the unity of the family whenever

possible"[1] and that a finding of dependency, must be based on "clear and convincing evidence."[2]

This requires the fact finder to use a greater degree of certitude in making a dependency determination than one based on preponderance of evidence. There will perhaps be occasions under this stricter standard when children will suffer because of the need for the intervention of government (and this may be one of those cases), but the legislature has decided (wisely, I believe) that the interest of society on the whole is better served by requiring a higher standard of proof[3] before allowing such intrusion by government. I agree therefore with Judge Spaeth's analysis that as to Leonna and Lisa, the proof does not quite measure up to the "clear and convincing" standard.

■ I agree also that the standard for adjudication of dependency as to Bobbie and Hollie was met. I disagree, however, with his conclusion that Judge Raup's opinion was not sufficiently comprehensive to justify the removal of Bobby from the family. He reviewed in considerable detail Bobby's school record, his actions in school, the report of the school psychologist.[4] While not exhaustive (and I know of

1. 42 Pa.C.S. § 6301(b)(1) (formerly 11 P.S. § 50–101).

2. 42 Pa.C.S. § 6341(c) (formerly 11 P.S. § 50–320).

3. "[A] standard of proof represents an attempt to instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, 378 (1970). Concurring opinion of Justice Harlan.

4. In his opinion Judge Raup stated:
  "Bobby was age seven at the time of the hearing and was a first grade student. He had missed eighteen and one-half of one hundred twenty-three days. School officials had observed that Bobby was functioning far below his ability. He seemed distracted in school, continually daydreaming. He displayed emotional problems manifested by "extra crying, extra fussing when he was apparently under any of the normal pressures that school puts on children. He was referred to Dr. Jacqueline Sallada, the school psychologist for the Intermediate Unit. The following is an excerpt from the testimony of Dr. Sallada as she discusses her interview with Bobby: (Dr. Sallada's testimony is substantially set forth in Judge Spaeth's Opinion at page 1065 ante). Judge Raup also had before him the school principal's

no such requirement), it was sufficiently comprehensive enabling us to fulfill our responsibility of broad review.

■ Small wonder then that Judge Raup concluded: "Bobby, because of his particular acute emotional problems was considered to need a prolonged period in foster care. He was placed in the custody of the agency for placement in a foster home." It was clear to him, as it is to me, that Bobby could not reasonably receive in his home situation, where the needs of the other three children were met at most marginally, the services and attention that his intellectual and emotional difficulties required.[5] There was indeed present the clear necessity for Bobby's separation from his mother and family.[6]

Accordingly, the order of the lower court declaring Leonna and Lisa dependent is reversed; otherwise, the order is affirmed.

SPAETH, J., files a concurring and dissenting opinion.

PRICE, J., files a concurring and dissenting statement.

PRICE, Judge, concurring and dissenting:

Since I would affirm the trial judge's order, I concur with Judge Lipez as to the children Bobby and Hollie. I dissent as to the majority's disposition as to the children Leonna and Lisa.

SPAETH, Judge, concurring and dissenting:

As Judge LIPEZ's opinion states, this is an appeal from an order declaring four children dependent. As to three of the children—Leonna, Lisa, and Hollie—Judge LIPEZ and I are

testimony, who stated, (as appears in Judge Spaeth's Opinion, post, p. 1067) "it was Bobby for whom *it's critical we get some help.*" Bobby was tested by the school psychologist who reported Bobby had intellectual and emotional difficulties."

**5.** The fact that Hollie was not separated from the family would not be justification for refusal to separate Bobby.

**6.** It may not be amiss to point out that such transfer of legal custody is "temporary." *See* 42 Pa.C.S.A. § 6351(a)(2).

in agreement. As to the fourth child—Bobby—we are only partly in agreement; we agree that he was properly declared dependent, but we disagree as to whether he should have been ordered placed in a foster home.

—1—

In reviewing an order such as the one before us, this court always gives great weight to the opinion of the hearing judge, who has seen the witnesses and may have talked to the children. *Clair Appeal*, 219 Pa.Super. 436, 281 A.2d 726 (1971). Nevertheless, we are not bound by a finding that has no competent evidence to support it. *Commonwealth ex rel. Morales v. Morales*, 222 Pa. Super. 373, 294 A.2d 782 (1972). Moreover, in a case such as this our scope of review is broad, *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437, 292 A.2d 380 (1972); *Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa.Super. 144, 331 A.2d 665 (1974), and it is our responsibility to ensure, both that the record represents a comprehensive inquiry, and that in responding to that record the hearing judge has applied the legal principles appropriate to the case, *see In the Interest of LaRue*, 244 Pa.Super. 218, 366 A.2d 1271 (1976); *Stapelton v. Dauphin County Child Care Service*, 228 Pa.Super. 371, 324 A.2d 562 (1974).

At the time of the hearings, which were held on March 21 and April 11, 1978, Leonna was 12, Lisa, 11 Bobby, 7, and Hollie, 6. Appellant and the four children had moved to Lycoming County from Texas about June of 1976. The children were fathered by at least two different men in Texas, neither of whom was providing support. In September 1977, appellant went to Philadelphia for two weeks to look for a job. She left the children with a babysitter, who abandoned them. The Lycoming County Children's Services Agency was made aware of this and the children were taken into emergency custody and placed temporarily in foster homes. When appellant returned from Philadelphia, the children were returned to her pursuant to an out-of-court agreement with Children's Services. The agreement specified that the agency would agree to continue a pending

action before the Common Pleas Court if appellant cooperated with the agency by providing it with names of babysitters for its approval; making an appointment with the community mental health agency; working with a nutrition aide; and attending an eight week parenting education course and weekly parents' group meetings at a local church.

The case worker employed by Children's Services testified that appellant had not provided the agency with a list of babysitters, and that she was using the babysitter who had abandoned the children in September. Appellant denied that she had again used the babysitter who had abandoned the children. She was not asked whether she had furnished the agency with a list of babysitters, but instead whether she had made the "arrangements" requested. She said she had. Appellant had made an appointment with the mental health center and had met with some therapists, but she stopped going to them when she felt her problems had worked themselves out because she no longer saw a boyfriend who had been causing a lot of her problems. Appellant had worked with, and at the time of the hearing was working with, a nutrition aide. Appellant had attended six out of the eight sessions of the parenting education course. She explained that she missed two sessions because one time she had a doctor's appointment for one of the children, and the other time she was not feeling well. Appellant had attended only two of the weekly parents' group meetings. She explained that she "just didn't enjoy them."

Leonna had missed 23 and one half days of school as of the 123rd day of school. A case worker testified that Leonna was "exhibiting problems [at school] of being withdrawn". N.T. 52. Leonna's principal testified that "she was having some trouble adjusting to the school". N.T. 5. Leonna had visited the school nurse's office 43 times during the course of the last school year. The "Health Room Log" included descriptions of the visits. Most of them concerned relatively minor ailments. The case worker testified that appellant imposed on Leonna responsibility for too many chores around the house and too much mothering.

Appellant acknowledged Leonna's considerable number of absences from school, but said that on the occasions Leonna had been sick with minor ailments. She also said that until recently, she had not been told of Leonna's visits to the school nurse. Appellant denied that she imposed to much responsibility on Leonna, saying, "[T]he only point I made is that they do their bedrooms. They put their clothes up, and they do the dishes once in a while. The rest of the business, I do." N.T. 99.

The hearing judge spoke to Leonna, in chambers with counsel present. Leonna told the judge that she didn't like school because the other children called her names because of where she lived (a low cost housing project). Also, she missed her friends in Texas. She said that when she had been absent from school it was because she was sick; she said that once she had had scabies. She described her chores substantially as had her mother, and said that she liked her mother and wanted to continue living with her. The case worker had testified that in January (that is, several months before the hearings) Leonna had told her "[t]hat she did love her mother, about the conditions at home were bad, that the mother did not seem to have time for the children, and that she really needed her mother, and that she just didn't have time for her.". N.T. 53. When the hearing judge asked Leonna about this, she said that she didn't remember what she had said to the case worker, that it was "[n]othing much," that what had been bothering her was "[m]e having to come to court", and also, "my sisters and my Mom, every time they'd pick on me, and I'd go to pick back on them, and I would get in trouble." N.T. 115. When questioned by counsel for Children's Services, Leonna said she had gotten to know one David Wright at school (counsel's questions indicated that Wright was a school counselor) and had talked to him about some of the things that upset her about her mother. She went on to say that her mother "helps us with our home work, and after we're all done with our home work, she plays around with us," and that she felt she could talk with her mother and had talked to her "[a]bout me

getting upset about some things that go on in the house, with me getting into trouble, but she sits and talks to me. Just that's the way it goes." N.T. 117. In response to a question from the hearing judge, Leonna said that "my Mom can't help me with my science and any other stuff. My history and geography she doesn't know." *Id.*

Lisa is in a special education class, and was experiencing academic difficulties. The school therefore asked appellant for permission to test Lisa, and appellant gave permission. The school then requested appellant to attend a conference. The principal testified that "I did have to send quite a few reminders, but [appellant] did come in. We did have the conference, and because of this, because of this parental response, Lisa is having a much better year this year. . . She's doing much, much better. She's a much happier child this year, because we able to work with [appellant] and Lisa's needs." N.T. 16.

The principal went on to testify that it was Bobby for whom "it's critical that we get some help." N.T. 16. Bobby was tested by the school psychologist, who reported that Bobby had intellectual and emotional difficulties. Specifically, the psychologist believed Bobby to be "intellectually deprived." N.T. 22. The psychologist also stated that Bobby became "very tense" when asked about his family. N.T. 19. "I could actually see the muscles tighten up in his throat. . . . He held his fists tightly. He started sweating. . . . He breathed heavily." *Id.* The psychologist continued her testimony as follows:

> He did answer questions. He said that he didn't have any chores at home, that most of the work was done by one older sister. That was who he counted on to help take care of him. The only positive thing he could share is that he gets paid for good grades. He indicated a lack of attention. He claimed that no one plays games with him, no one reads to him, and he was lonely much of the time. He spoke very maturely about the sadness he feels about not having a real father, and I questioned him if there was a substitute or someone else he could count on to be

like a father to him, and he denied that anyone was really like a father to him. He spontaneously brought up his foster family, without my asking, and at the point where I asked him to draw a picture of his family, he didn't draw a picture of his natural family. He automatically drew a picture of his foster family [i. e., the foster family with which Bobby was temporarily placed in September, when abandoned by the babysitter] and spontaneously began responding about the wonderful time he had there. I saw a real easing of the tension, the kind of signs which a psychologist looks for, especially when they're doing relaxation activities with clients. He started breathing at a normal rate, the sweat stopped, the facial tension stopped, there was no clenching of fists anymore, and he was a relaxed, happy little boy. In fact, he was smiling and talking about his foster family in detail, including extended family members, relatives of the foster parents and activities, sports, things he had gotten interested in there, and he openly expressed a desire to return there. That was a part of the personality testing. Another part of the personality testing involved my showing Bobby pictures of various animal scenes and family scenes, and he would make up stories about them. His stories were not ones of an emotionally disturbed, highly anxious child, but they were stories which were violent. In every story an animal either died or was attacked or was eaten up. The characters were vulnerable, and the stories ended sadly or indecisively, and there was quite a bit of aggressiveness in the stories, and he appeared to be desensitized to that aggressiveness, as if to say this was a way of life, because it was story after story without signs of high anxiety during the story telling, so that was an accepted pattern, a vicious life style, at least in his imagination, and he was also, when I did academic work with him, I followed up the personality testing with academic work. At that time, I saw strength and weaknesses, which I pointed out to the teachers in some of the academic skills. I noted a real tendency to day dream, and every time I asked him what he was day dreaming about when he was doing his aca-

demic work, he would tell me of real family events that had upset him. N.T. 20–21.[1]

Hollie was of pre-school age at the time of the hearing and suffered from a speech defect (stuttering). She attended a Head Start program in the morning and a special program conducted by the Lycoming County Crippled Children Society in the afternoons. One of her teachers at the afternoon program testified that she was very moody and withdrawn and was not achieving her potential. Another teacher testified that Hollie was disheveled and unclean and seemed "very, very tired", N.T. 43, sleeping through many of the class room activities, which were very noisy, and being unwilling to participate in them at all. A speech therapist who worked with Hollie also testified that Hollie had recently been dirty, on one occasion smelling of vomit, or what seemed to be vomit, on another, of urine. A teacher's aide who rode in the Crippled Children Society van home with Hollie testified that Hollie slept the whole way. The aide also testified that on two occasions nobody was present to pick Hollie up when the van returned her to a place near her home, as was required by school regulations. Appellant acknowledged that Hollie was usually asleep when she got home, but apparently (her testimony is not

1. Appellant argues that the testimony of the school psychologist was improperly admitted. She relies on 24 Pa.C.S.A. § 13–1319 (Supp. 1978–79), which states in pertinent part:

   No guidance counselor, school nurse, school psychologist, or home and school visitor in the public schools or in private or parochial schools or other educational institutions providing elementary or secondary education . . . who, while in the course of his professional or clerical duties for a guidance counselor, home and school visitor, school nurse or school psychologist, has acquired information from a student in confidence shall be compelled or allowed . . . if the student is under the age of eighteen (18) years, without the consent of his or her parent or legal guardian, to disclose that information in any legal proceeding, civil or criminal

   . . .

   Appellee responds that the psychologist did not testify to any "confidential" information. We do not decide this issue, however, because appellant did not object to the psychologist's testimony at the hearing. Cf. *Beeruk's Estate*, 429 Pa. 415, 241 A.2d 755 (1968) (Dead Man's Act); *Huffman v. Simmons*, 131 Pa.Super. 370, 200 A. 274 (1938) (husband-wife communications).

entirely clear) attributed Hollie's fatigue to her long daily schedule, which started at 7 a. m., when she got up and got ready to go to the Head Start program. Appellant also acknowledged the two occasions when nobody was present to pick Hollie up, but she indicated that in a year and a half these had been the only such occasions and said she had made arrangements so that Hollie would always be picked up by someone.

The lower court justified its order by stating that "[t]he overall picture presented at the hearing was one of four children being raised in an environment which was intellectually and emotionally deprived. The children's right to progress and to develop their potential was being frustrated by a mother who had good intentions but apparent inability to follow through on those intentions." Slip. op. at 6.

–2–

Section 50–102(4) of the Juvenile Act states:

"Dependent child" means a child who: (i) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals; . . .

In *In the Interest of LaRue, supra,* we stated that "[t]he burden of proof should be on the party asking that the child be taken from its parents, and before the hearing judge may find the child deprived [now, dependent], the evidence must be 'clear and convincing.'" *See also In Re: Paul Kunkle and Edward Kunkle,* 265 Pa.Super. 605, 402 A.2d 1037 (1979); *In the Interest of Lisa Whittle,* 263 Pa.Super. 312, 397 A.2d 1225 (1979). Here, we cannot tell whether the hearing judge applied this standard of proof, for although at the end of his opinion the judge states that he "rejects [the] assertion" by appellant that the evidence was insufficient, he does not state by what standard he found it to be sufficient. Slip op. at 7. Be this as it may, the responsibility remains on us to determine whether the evidence of dependency was clear and convincing. *In the Interest of LaRue, supra.* In making this determination, it will be convenient first to consider the evidence regarding Lisa,

then that regarding Leonna, and last, that regarding Bobby and Hollie.

■ It may be that at some time in the past Lisa was dependent. It cannot be maintained, however, that the evidence presented to the hearing judge offers any reason, much less a clear and convincing reason, for a finding that she is dependent now. To the contrary, as discussed above, Lisa's principal testified that appellant had responded to the school's plans to help Lisa, and that in consequence, "She's doing much, much better. She's a much happier child . ." Beyond this, there was virtually no evidence regarding Lisa.

As regards Leonna: If the standard of proof were a mere preponderance of the evidence, perhaps it might be said that the evidence was sufficient to support a finding of dependency. However, when the proper standard is applied—that the evidence of dependency must be clear and convincing— one is obliged to conclude that the evidence was insufficient.

Many children "hav[e] some trouble adjusting" to school, especially if they have moved from far away, and feel lonely and rejected by the other children. Also, many children miss a good number of school days because of minor illnesses. We do not suggest that appellant's care of Leonna has been all it should have been. Certainly Leonna should never have suffered from scabies; and her statement to the case worker in January is evidence that she felt rejected by her mother. It seems apparent, however, that appellant's care of Leonna has considerably improved; Leonna herself indicated as much, both to the hearing judge and in answering questions asked her by counsel for Children's Services. Thus she said that as of the time of the hearing, "[A]fter we're all done with our home work, [her mother] plays around with us," and that she felt able to sit and talk with her mother "[a]bout me getting upset about some things that go on in the house." Moreover, there was no testimony that Leonna is not doing her schoolwork satisfactorily,[2] or that she is

2. Appellant did testify that when Leonna was in Texas, she was an "A" and "B" and "C" student. N.T. 82. Exhibit 2 contained Leonna's academic record at the time of the hearing. It indicated some

poorly fed, or poorly sheltered, or poorly clothed. Nor is there any suggestion that she is abused in any way. It may be that at one time she was required to do too many chores. Her answers to the hearing judge's questions, however, do not suggest that that is so now.

When asked what was the Children's Service's recommendation, a case worker answered, "That the children be placed in foster care." N.T. 52. She went on to say that the reasons for this recommendation were:

Six months have gone by, and since the contract has not been followed, and we don't have any reason to believe that it will be followed in the future. The children are having problems, exhibiting problems at school, and Leonna is exhibiting problems of being withdrawn, and I just feel that the Agency is not making any impact whatsoever.

No doubt appellant did not in all respects abide by "the contract" she made with Children's Service. The record shows, however, that she did do most of what she agreed to do. We have repeatedly emphasized that an agency's relationship with the parent is not to be defined in legalistic or punitive terms. *In The Interest of LaRue, supra* (collecting cases). The agency's and the court's primary purpose must always be to preserve and strengthen the family. Thus we have recently said:

Even when there are inadequacies in the child's home, the court should first consider ordering [the agency] to take the steps necessary to instruct the parents in the skills needed, and provide follow-up supervision in the home, where feasible. *Matter of DeSavage,* 241 Pa.Super. 174, 187, 360 A.2d 237, 243 (1976). *In the Interest of Lisa Whittle,* 263 Pa.Super. 312, 397 A.2d 1225 (1979).

Here steps have been taken to help appellant become a better parent, and as regards Leonna, the evidence is that the steps have been productive.

decline in her performance, which may be attributed to readjustment problems she was experiencing.

■  The same cannot be said, however, with regard to Bobby and Hollie, and as to them we have no difficulty in concluding that the evidence of dependency was clear and convincing.  We have quoted some of the psychologist's testimony regarding Bobby;  in his opinion the hearing judge also quotes some of this testimony, which was unrebutted.  Every indication is that Bobby is not receiving the parental support he needs.  The same is so of Hollie.  If anything, the testimony of the representatives of the Crippled Children Society who worked with Hollie depicted a situation more serious than Bobby's.

I therefore concur in Judge LIPEZ's conclusion that we should reverse the hearing judge's order to the extent that it declares Leonna and Lisa dependent, but affirm it to the extent that it declares Bobby and Hollie dependent.

–3–

The foregoing conclusion, by a majority of the panel of this court, does not end our consideration of the case, for the hearing judge further ordered that Bobby be taken from appellant and placed in a foster home.  As expressed in their separate opinions, Judge PRICE and Judge LIPEZ believe that this order should be affirmed, and it therefore will be. In my view, we should remand for a further hearing on whether there are alternative services available to Bobby, and if there are, whether the services are such as to make it appropriate that Bobby remain with his family.  My reasons for this conclusion are as follows.

In deciding the disposition of a "dependent" child, the hearing judge is to make such order as is "best suited to the protection and physical, mental, and moral welfare of the child."  11 P.S. § 50–321(a) (Supp.1978–79).  In *In the Interest of LaRue, supra*, 244 Pa. at 229, 366 A.2d at 1276, we stated: "[The judge] should try 'to provide for the care, protection, and wholesome mental and physical development' of the child, and at the same time he should try '[t]o preserve the unity of the family whenever possible.'" (quoting 11 P.S. § 50–101).  A child should only be taken from his or her parents in cases of "clear necessity."  *In the*

*Interest of Lisa Whittle, supra; In the Interest of LaRue, supra.* Here, the hearing judge allowed Hollie to stay with appellant, subject to the "protective supervision" of Children's Services for one year. It is apparent from this disposition that the judge found no clear necessity for taking Hollie from her mother, for his order is plainly intended to allow Hollie to get the help she needs without sacrificing the unity of her family. It is not apparent, however, why the judge did not make a similar disposition regarding Bobby. As has been discussed, the testimony does not suggest that Bobby is more in need of help than Hollie but, if anything, that Hollie's situation is the more serious. Clearly, Bobby has serious problems—the lack of intellectual stimulation, the tensions of a transient home life, the lack of a true father figure. Nevertheless, a hearing judge should not take a child from his family unless the judge has first determined that there are no alternative services that would permit the child to remain within the family. *In the Interest of Lisa Whittle, supra; see also In re: Paul Kunkle and Edward Kunkle, supra* (dissenting opinion by SPAETH, J.). Here there was no such determination.

We have said in other cases that to enable us to fulfil our responsibility of broad review, the hearing judge must file a comprehensive opinion. *See Commonwealth ex rel. Forrester v. Forrester*; (J. 667/1977, filed June 27, 1978); *Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976); *Commonwealth ex rel. Grillo v. Shuster*; 226 Pa.Super. 229, 312 A.2d 58 (1973). In the absence of such an opinion, we have remanded for a fuller opinion, and if appropriate, a further hearing. *See Commonwealth ex rel. Forrester v. Forrester, supra.* The essence of a comprehensive opinion is that the hearing judge must explain his disposition of the child by reference to the record. *See Commonwealth ex rel. Forrester v. Forrester, supra.* Accordingly, when upon examining the record we have found significant gaps, or testimony that appears significant but regarding which the hearing judge has said nothing, we have remanded. *See Commonwealth ex rel. Forrester v. Forrester, supra.*

Here, the hearing judge did not explain the basis of the difference in his disposition of Hollie and Bobby, and in my view, this failure, and the absence of any testimony regarding whether there are alternative services that would permit Bobby to remain within the family, require us to remand. In so concluding I do not mean to intimate any opinion as to what the determination on remand should be. Whether there are alternative services available to Bobby, and if there are, whether the services are such as to warrant Bobby remaining with his family, are matters of fact that can only be decided by the hearing judge upon appropriate evidence. Moreover, I join in Judge LIPEZ's observation that the hearing judge, Judge RAUP, "was acutely sensitive to the needs of the children and was anxious to meet their needs." By remanding we should enable the judge to meet those needs on the basis of a fully developed record.