In the Interest of: R.W.J.

Appeal of: J.J., Natural
Mother, Appellant.

Children and Youth Services of
Butler County, Appellee.

Superior Court of Pennsylvania.

Submitted March 3, 2003.
Filed May 28, 2003.

Cathy S. Boyer, Butler, for J.R.W.

Daniel E. Houlihan, Butler, for CYS of Butler County.

BEFORE: TODD, GRACI, and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 Appellant, J.J. ("Mother"), asks us to determine whether the Butler County Children and Youth Agency ("Agency") met its evidentiary burden to support the order of the Butler County Court of Common Pleas, which adjudicated R.W.J. a dependent child, and continued him in the care, custody and control of the Agency. We hold that the Agency met its evidentiary burden to support the dependency order under review, and that the court's decision is based on a comprehensive in-quiry and the application of appropriate legal principles. Accordingly, we affirm.

¶ 2 The relevant facts and procedural history of this appeal are as follows. Mother and R.W., R.W.J.'s natural father, were admitted paramours. Prior to the birth of R.W.J., the couple produced another child, who died at the age of ten weeks. R.W. was found criminally responsible for that child's death. Additionally, the deceased child's autopsy report revealed that she also had healing rib fractures at the time of her death. Mother has had six other children. The oldest child lives with his father in Maryland. Four of Mother's other children were also removed from her custody. Mother's sixth child was the one who died at the hands of its father, R.W.

¶ 3 Upon learning that Mother and R.W. were going to have another child, the Agency filed its motion to detain the infant at the time of birth. The Agency argued for detention of the newborn child, based upon safety concerns for the newborn child and Mother's failure to comply with the requirements imposed upon her concerning her four other children, the parental rights to whom she later voluntarily relinquished. Specifically, the Agency identified numerous services, including individual counseling, that it had provided to Mother to no avail. Mother had not complied with compulsory drug and alcohol therapy, had failed to attend parenting classes, had failed to maintain suitable housing, and had failed to remedy the cause of the other children's placement. On April 4, 2002, the trial court ordered the Agency to take custody of the newborn child directly from any hospital in which Mother might give birth. The hospital was authorized to retain and deliver the newborn child into the Agency's custody. R.W.J. was born on April 16, 2002. He

was immediately placed in approved foster care.

¶ 4 On April 24, 2002, a Master filed findings and recommendations of adjudication and temporary disposition, which recommended dependency. The Master noted as reasonable the Agency's decision not to offer immediate services to prevent removal due to the emergency nature of the situation, safety considerations of the child, and other family circumstances. A permanency hearing was scheduled within fourteen days of the adjudication, at which time Mother requested that the matter be heard by a judge. On June 5, 2002, a permanency hearing ensued before the Honorable John H. Brydon.[1] By Order dated June 28, 2002, the court directed that R.W.J. remain in the legal custody of the Agency with placement to continue in an approved foster home. Further, all visitation was to be supervised. The court also incorporated by reference the Agency's family service plan for Mother, which provided for drug and alcohol counseling, random drug screenings, supportive foster care casework and programs, and supervised visitation to assist bonding between Mother and child. R.W. was not considered a safe resource for the child. This timely appeal followed.

¶ 5 On appeal, Mother raises two issues for review:

DID THE TRIAL COURT ERR BY RELYING ON ASSERTIONS THAT [MOTHER] COULD NOT CARE FOR [R.W.J.] THAT WERE BASED SOLELY ON [MOTHER'S] PRIOR PARENTING MISTAKES AND PAST HISTORY OF DRUG AND ALCOHOL ABUSE WHEN NO EVIDENCE WAS PRESENTED AT THE PERMANEN-CY HEARING TO PROVE THAT SUCH BEHAVIORS WERE ONGOING?

DID THE TRIAL COURT FAIL TO ESTABLISH THAT A "CLEAR NECESSITY" COMPELLED THE REMOVAL OF [R.W.J.] FROM [MOTHER'S] CARE?

(Mother's Brief at 3).

¶ 6 The relevant standard and scope of review in child dependency matters provides:

In child dependency matters, we must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature.

*In re C.J.*, 729 A.2d 89, 92 (Pa.Super.1999) (internal citations omitted). It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. *Matter of George*, 272 Pa.Super. 173, 414 A.2d 1063 (1979). Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses. *In re M.K.*, 431 Pa.Super. 198, 636 A.2d 198 (1994), *appeal denied*, 537 Pa. 633, 642

---

1. Counsel represented R.W. at the permanency hearing. At that time, the Agency had not included R.W. in R.W.J.'s family service plan for safety reasons. After the trial court's order, the record indicates R.W. took no further action. R.W. is not a party to the instant appeal.

A.2d 486 (1994), *cert. denied,* 513 U.S. 962, 115 S.Ct. 423, 130 L.Ed.2d 338 (1994).

¶ 7 Initially, Mother claims it is her basic and fundamental right to care for her newborn child and interference in the parent-child relationship is permissible only in extreme circumstances. Mother insists the Agency, through the court, removed the newborn child from her care without meeting the necessary criteria for removal. Mother argues the Agency did not meet its burden to prove by clear and convincing evidence that Mother had resumed her relationship with the baby's father, who has a violent history. Further, Mother submits her failure to attend and complete parenting classes in the past cannot be held against her with respect to R.W.J., as those classes were ordered for the exclusive purpose of regaining custody of four different children. Mother insists she has wisely used the time of separation from R.W.J. Mother claims to be working toward a drug and alcohol free lifestyle, stable home environment, and steady employment. Mother concedes that the baby was a dependent child at the time of his birth, to the extent the Agency would have ensured his health. However, Mother insists there has been no "conclusive evidence" that she has resumed a relationship with R.W. Mother concludes the court abused its discretion when it continued R.W.J. as a dependent child without exploring other feasible alternatives or options. We disagree.

¶ 8 The Agency counters that Mother previously gave birth to another child, the father of whom later pleaded guilty to the charge of involuntary manslaughter (blunt force head trauma) concerning the child's death at the age of ten weeks. After R.W. and Mother had completed various prison sentences, they found each other again and produced R.W.J. Despite Mother's protestations to the contrary, the Agency claims it was unable to ensure the safety of this child in Mother's home. The Agency also directs our attention to the fact that Mother did not ever complete the various requirements imposed upon her by the juvenile court regarding her other children, choosing instead to relinquish her parental rights voluntarily. The Agency insists the recent amendments to the Juvenile Act mandate that the child's safety take precedence over the parent's wishes for reunification. The Agency submits Mother's claim, that there is no conclusive proof of resumption of the relationship between Mother and father, is disingenuous, as the newborn child is conclusive proof of that relationship. In light of these circumstances, the Agency concludes the court properly ordered continued dependency and foster care for R.W.J. We agree.

¶ 9 A dependent child is defined in the Juvenile Act as, *inter alia:*

**"Dependent child."** A child who:

(1) is without proper parental care or control, subsistence, education as required by law, or *other care or control* necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk;

\* \* \*

42 Pa.C.S.A. § 6302.

¶ 10 In 1998 (effective January 1, 1999), Section 6301 of the Juvenile Act was amended as follows, in relevant part, to include the safety of the child as a significant consideration:

**§ 6301. Short title and purposes of chapter**

\* \* \*

**(b) Purposes.**—This chapter shall be interpreted and construed as to effectuate the following purposes:

(1) To preserve the unity of the family whenever possible or to provide an alternative permanent family when the unity of the family cannot be maintained.

(1.1) To provide for the care, protection, **safety** and wholesome mental and physical development of children coming within the provisions of this chapter.

\* \* \*

(3) To achieve the foregoing purposes in a family environment whenever possible, separating the child from parents only when necessary for his welfare, **safety** or health or in the interests of public safety.

\* \* \*

42 Pa.C.S.A. § 6301(b)(1), (1.1), (3) (emphasis in text added). Moreover,

Pursuant to 42 Pa.C.S.A. § 6302, **Definitions, "Aggravated circumstances"**, (2), aggravated circumstances exist when the child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect.

*In re A.H.,* 763 A.2d 873, 877 (Pa.Super.2000) (internal quotation marks omitted). "The Juvenile Act authorizes state agencies and the courts to ensure that parents meet certain legislatively determined irreducible minimum standards in executing their parental rights." *In re J.W.,* 396 Pa.Super. 379, 578 A.2d 952, 957–58 (1990).

Furthermore, when determining whether a parent is providing a minor with proper care and control. . .the caretaker's acts and omissions should weigh equally. The parental duty extends beyond mere restraint from actively abusing a child; rather, there exists a duty to protect the child from the harm that others may inflict.

*In re A.H., supra* at 876 (internal citations and quotation marks omitted). The petitioner bears the burden of proof in a dependency hearing, and must prove by clear and convincing evidence that "(1) the child is presently without proper parental care or control; and (2) such care and control is not immediately available." *In the Interest of JOV,* 454 Pa.Super. 630, 686 A.2d 421, 422–23 (1996).

¶ 11 Pennsylvania law makes clear that a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent. *In Interest of Black,* 273 Pa.Super. 536, 417 A.2d 1178 (1980) (holding prognostic evidence sufficient for finding of dependency of newborn infant where parent's two previous children died because of parent's improper care and failure to take necessary precautions). The court must make a comprehensive inquiry into whether proper parental care is immediately available or what type of care Mother could provide in the future. *Matter of DeSavage,* 241 Pa.Super. 174, 360 A.2d 237 (1976) (rejecting argument that child cannot be adjudicated dependent unless child is actually in custody of parents and they are shown unable to render care or control as defined in statute). In this regard, the *DeSavage* Court reasoned:

Obviously, state interference with a parent-child relationship is a most serious intrusion. . .such an intrusion is properly tolerated only in cases in which the Commonwealth sustains a very strict burden of proof. . . . The rule of law appellants request us to announce is ov-

erly restrictive. The legislature defined ["dependent child"] in exceedingly broad terms precisely because it is impossible to foresee all the possible factual situations that may arise. Further the broad definition enables the experienced juvenile court judge to apply his training and compassion to the unique facts of each case. The proposition asserted by appellants would compel the juvenile court judge to place the child in the home of the natural parents to determine whether they are able to render proper care, and ignores the possibility that if the "experiment" proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal.

*Id.* at 241–42.

¶ 12 With respect to Mother's issue, the trial court noted two factors upon which it based its order:

Firstly, the Court notes that [R.W.J.] was fathered by [R.W.], an individual previously found criminally responsible for the death of a prior child parented by [Mother] and himself. [Mother's] resumption of a relationship with [R.W.] following the death of the said child demonstrated to the Court that [Mother] has continued to make choices that may fail to comport with the safety of her children. Given the relatively short time period between the birth of [R.W.J.] and the hearing, the Court did not feel [Mother] had presented sufficient evidence to demonstrate that she was determined to begin to take the necessary measures and make the proper choices in order to assure the safety of [R.W.J.].

Secondly, the Court based it decision on [Mother's] failure to complete the services ordered by [the Agency], including a Drug and Alcohol Program and parenting classes. Considering the best interests of the child, and [Mother's] history of severe drug abuse, the Court agreed with the recommendation of [the Agency] that the juvenile not be returned to [Mother] until she makes substantial progress in the recommended programs.

(Trial Court Opinion, filed October 4, 2002, at 1–2). Our review of the record in light of the applicable rules of law confirms that the safety and best interests of R.W.J. are best served by the order under review. Mother needs to comply with the various requirements imposed upon her by the juvenile court, as Mother's parenting skills have long been called into question and she has a history of noncompliance. The Agency has a compelling case in support of its assertion that proper parental care or control of R.W.J. is not immediately available at the hands of his Mother. *See In the Interest of JOV, supra.* Thus, we agree with the court that a family plan must be enforced before Mother can have custody of this child. *See In re J.W., supra.* Mother chose to reunite with the man who pleaded guilty to the death of another child. Contrary to Mother's contention, R.W.J. is the most demonstrative and conclusive proof of that reunion. Based upon the legitimate prognostic evidence, the Agency has shown the safety of this child is in jeopardy. *See In Interest of Black, supra.*

¶ 13 Accordingly, we hold that the Agency met its evidentiary burden to support the dependency order under review. We further hold that the court's decision is based on a comprehensive inquiry and the application of appropriate legal principles; that is, full consideration of whether proper parental care is immediately available to R.W.J. and what type of care Mother can provide in the future. *See Matter of George, supra; Matter of DeSavage, su-*

*pra.* Accordingly, we affirm the court's order under the circumstances of this case.

¶ 14 Order affirmed.