J-A10012-16
J-A10013-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.W. | No. 1079 WDA 2015 |

Appeal from the Order entered June 16, 2015
In the Court of Common Pleas of Allegheny County
Family Court, at No(s): CP-02-DP-0002407-2013

| | |
|---|---|
| IN THE INTEREST OF: J.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.W. | No. 1446 WDA 2015 |

Appeal from the Order entered August 21, 2015
In the Court of Common Pleas of Allegheny County
Family Court, at No(s): JV-13-2407

| | |
|---|---|
| IN RE: J.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.W., BIOLOGICAL FATHER | No. 1080 WDA 2015 |

Appeal from the Order entered June 16, 2015
In the Court of Common Pleas of Allegheny County
Family Court, at No(s): DP-2407-2013
JV-13-2407

| | |
|---|---|
| IN RE: J.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.W., BIOLOGICAL FATHER | No. 1450 WDA 2015 |

Appeal from the Order entered August 21, 2015
In the Court of Common Pleas of Allegheny County
Family Court, at No(s): JV-13-2407
No. DP-2407-2013

J-A10012-16
J-A10013-16

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and PANELLA, J.

MEMORANDUM BY PANELLA, J.:                **FILED SEPTEMBER 02, 2016**

R.W. ("Mother") and J.W. ("Father") appeal from the orders entered on June 16, 2015, and August 21, 2015, with regard to their minor child, J.W., ("Child"), a male born in November 2013. In the June 16, 2015 order, the trial court adjudicated Child dependent pursuant to § 6302(1) of the Juvenile Act, 42 Pa.C.S.A § 6301, *et seq.*, and placed him in the care of his maternal grandmother, N.K. ("MGG"), in his own home. That order further permitted Mother and Father to remain in the home, with the provision that MGG supervise all of their contact with the minor child and directed the parents to have mental health evaluations. In the August 21, 2015 order, the trial court found that Child continues to be dependent under the Juvenile Act and found that, despite the parents' substantial compliance with the permanency plan, Child's safety continues to be at risk because neither parent has been able to address the circumstances that led to the June 16, 2015 dependency adjudication. The trial court further found that the parents' mental health evaluation was not helpful in determining a manner in which Child will be safe in his parents' unsupervised care. Therefore, the trial court directed the parents to undergo individual counseling and couples counseling, to assist the parents in "opening up" about the circumstances of Child's injuries. After careful review, we affirm both orders.

- 2 -

In its August 17, 2015 opinion, the trial court set forth the following factual background and procedural history regarding this appeal, which we incorporate herein, as follows.[1]

I. First Dependency Adjudication

This appeal is from a second adjudication of dependency. However, the facts surrounding the first adjudication are relevant to the present case. On December 19, 2013, Mother took J.W. to the emergency room at Children's Hospital of Pittsburgh ("Children's Hospital") due to unexplained marks that she discovered on his face and body. ***See*** Testimony of Transcript ("T.T."), dated January 31 & February 4, 2014, at 12-13. Mother testified that she had been at home with J.W. since Father had left for work on the morning of December 19, 2013. ***Id***. at 229. Father returned to the home around midnight, from a work engagement, at which time [m]other went to shower as she had not been able to do so while Father was at work. ***Id***. at 231. Following an approximate seven[-]minute shower, Mother noticed what she believed to be a red rash on J.W.'s face. ***Id***. at 233. After contacting J.W.'s pediatrician's office, Mother examined the remainder of J.W.'s body and discovered "small irregular marks on his lower abdomen." ***Id***. at 235. Not knowing how he obtained the "marks" on his body, Mother took J.W. to the Children's Hospital emergency room.

The emergency room physician contacted Dr. Jennifer Wolford, an attending physician in the Children's Hospital Child Advocacy Center, to further examine J.W. ***See*** [***i***]***d***. at 9. During her examination of J.W., Dr. Wolford discovered additional markings on J.W.'s back; she diagnosed the marks on J.W.'s back, abdomen and face as bruises that could not have been self-inflicted. ***See*** T.T., dated January 31 & February 4, 2014, at 12, 19. Following Dr. Wolford's examination, J.W. had a skeletal survey, which initially[2] did not reveal any fractures. ***Id***. at 18. However, a referral was subsequently made to the Office of Children, Youth and Families (CYF). ***Id***. at 139.

---

[1] We note that the trial court made an apparent clerical error in its opinion when it stated that the appeal was from its February 16, 2015 order. ***See*** Trial Court Opinion, 8/17/15 at 1.

CYF caseworker Nicholas Zdral was appointed to investigate the circumstances of J.W.'s injuries and interviewed Dr. Wolford as well as both parents. *Id*. Following Mr. Zdral's interview with the parents, CYF "decided to obtain an emergency court order to remove" J.W. from the home. *Id*. at 159. Following a shelter hearing on January 2, 2014, J.W. was placed with his maternal great aunt and uncle. *Id*.

J.W.'s follow-up skeletal survey at Children's Hospital revealed a healing fracture in his right radius.[3] *See* T.T., dated January 31 & February 4, 2014, at 20. Dr. Wolford testified that such an injury would have only resulted from an amount of force being applied to the bone and was consistent with abuse.

At the adjudicatory hearing on January 31, 2014, I found J.W. dependent due to the unexplained injuries that he sustained, which could not have happened without an adult's knowledge. J.W. was subsequently placed in the physical custody of his parents; however, all contact with Mother and Father was to be supervised. J.W.'s dependency case was ultimately closed, and court supervision terminated, on August 8, 2014, when Mother and Father completed all of their family service plan goals.

Il. Current Dependency Adjudication

On April 25, 2015, the family returned to Children's Hospital due to injuries that J.W. sustained from an alleged accidental fall in the home. *See* T.T., dated June 3, 2015, at 39. According to Mother, while she was carrying J.W. in her arms that morning, she missed a step and fell down the stairs of her home. *See* T.T., dated June 16, 2015, at 57. Upon realizing that J.W. was favoring his left leg, Mother contacted the pediatrician to schedule an appointment for J.W. later that morning. *Id*. at 58. After meeting with J.W.'s primary care physician, Dr. Brad Kramer, Mother and Father took J.W. to have x-rays conducted at the Cranberry Township site of UPMC Passavant. *Id*. at 64. After reviewing the x-ray results, Dr. Kramer informed Mother that J.W. had fractured his right tibia and would need to see a pediatric orthopedic surgeon at Children's Hospital. *Id*. Upon learning that they would have to take J,W. to Children's Hospital, Mother and Father demonstrated discontent with having to

- 4 -

return to Children's Hospital by contacting their attorney, Wendy Williams, and their families, prior to actually taking J.W. to the hospital. *Id*. at 64, 93. After being convinced that taking J.W. to Children's Hospital was in his best interest, Mother and Father took J.W. to meet with a pediatric orthopedic surgeon. *Id*.

Prior to seeing pediatric orthopedic surgeon, Dr. Timothy Ward, J.W. was first examined by the emergency room physicians. *See* T.T., dated June 16, 2015, at 142. Although the emergency room physician assistant recommended that J.W. receive a skeletal survey, the parents initially refused such treatment. *See* T.T., dated June 3, 2015, at 39. Due to the parents' reluctance and the nature of J.W.'s injuries[,] the physician assistant contacted Dr. Wolford[,] who then recommended that the skeletal survey be completed due to J.W.'s past injuries, and the fact that the 2014 skeletal survey revealed J.W.'s previous right radial fracture. *Id*. at 40. Mother and Father did not inform the physician assistant of J.W.'s prior injuries or the fact that J.W.'s previous right radial fracture, in connection with the prior dependency case, had been revealed pursuant to a skeletal survey. *See* T.T., dated June 16, 2015, at 149.

Following a great deal of back and forth between the parents, their attorney and the emergency room staff, Mother and Father ultimately agreed to the skeletal survey under the condition that they were permitted to observe the procedure. *Id*. at 65. Following the completion of the skeletal survey, a second fracture was revealed in J.W.'s left radius. *See* T.T., dated June 3, 2015, at 40. After the emergency room physicians finished treating J.W. for his two fractures, the family met with Dr. Ward, the pediatric orthopedic surgeon to whom Dr. Kramer had referred them. *See* T.T., dated June 16, 2015, at 11.

During their consult with Dr. Ward, the parents failed to accurately characterize J.W.'s prior involvement with Children's Hospital and CYF. *Id*. at 11-12. Despite the fact that J.W. was previously admitted in 2013 for bruises on his face and body, the parents told Dr. Ward that J.W. was treated for a wrist fracture and implied that CYF's involvement in the case was rather brief. *Id*. During the June 16, 2015 hearing, Dr. Ward testified that although he found J.W.'s contralateral fractures unusual, he "allowed the appearance of the family" and his short interaction

with the family to "considerably" affect his opinion.[5] *Id*. at 9, 11. After speaking with Dr. Wolford and receiving J.W.'s complete medical history, Dr. Ward amended his initial medical opinion, that J.W.'s injuries were not due to abuse. *Id*. at 15-16. Due to J.W.'s previously unexplained bruises, the parents' "failure to be forthright" regarding their involvement with CYF, the parents' misrepresentation regarding the discovery of J.W.'s 2013 right radial fracture on the skeletal survey, and their lack of candor to the emergency room physicians, Dr. Ward later concluded that J.W.'s injuries were the result of abuse. *Id*. at 30.

On April 30, 2015, CYF received a child line report for J.W. *See* T.T., dated June 3, 2015, at 149. Following an interview with both parents and an evaluation of their home, CYF caseworker Robert Banks filed a petition for dependency on May 07, 2015. A two-day adjudicatory hearing was held on June 3 and June 16, 2015 on CYF's dependency petition, after which [the trial court] entered the Order that is the subject of this appeal.

_____

[1] Father testified that when asked about the marks on J.W.'s body, he told Mother that he was unaware as to how J.W. came to have the marks on his face or body. *See* T.T., dated January 31 & February 4, 2014, at 318.

[2] A subsequent skeletal survey was scheduled for January 2, 2014. Dr. Wolford testified that it is hospital protocol to conduct a subsequent skeletal survey as healing fractures "show up better" than acute fractures on the x-rays. *See* T.T., dated January 31 & February 4, 2014, at 20.

[3] Pediatric radiologist, Dr. Stefano Bartoletti, stated that he was able to later identify the healing fracture on the initial skeletal x-rays after identifying the fracture on the subsequent skeletal survey x-rays. *See* T.T., dated January 31 & February 4, 2014, at 125, 127.

[4] The parents alleged that J.W.'s injuries in connection with the prior adjudication were caused by hospital personnel in performing the skeletal survey. *See* T.T., dated January 31 & February 4, 2014, at 266-269. [The trial court] did not adopt this theory in connection with the past case.

[5] At the hearing on June 3, 2015, Dr. Wolford testified that the fact that J.W. had a fracture on his right leg and left arm, as a result of this accident, was "highly concerning" for abuse. *See* T.T., dated June 3, 2015, at 42

Trial Court Opinion, 8/17/15, at 1-6 (unpaginated; footnotes in original).

In the June 16, 2015 order, the trial court adjudicated Child dependent pursuant to the Juvenile Act and placed him in the care of MGG, in his own home, permitting Mother and Father to remain in the home, with the provision that MGG supervise all of their contact with the minor child. The order also directed the parents to have mental health evaluations.

The trial court continued the factual background and procedural history of the case in its opinion entered on October 30, 2015, as follows.

On August 21, 2015, following a permanency review hearing on the above-captioned matter at which all parties were represented by counsel, [the trial court] found that the minor child, J.W., continues to be a Dependent Child pursuant to the Pennsylvania Juvenile Act (*See* 42 Pa.C.S. §6302(1)). Despite the parents' substantial compliance with the permanency plan, the [trial court] found that J.W.'s safety continues to be at risk because neither parent has been able to address the circumstances which led to the June 16, 2015 dependency adjudication. [The trial court] further found that the mental health evaluation was not helpful in determining a manner in which J.W. will be safe in his parents' unsupervised care. . . .

Following the adjudicatory hearing, [the trial court] scheduled a permanency review hearing for August 21, 2015, and [the trial court] ordered the parents to attend mental health evaluations to determine if there were any mental health issues that they could address which would insure J.W.'s safety. At the August 21, 2015 Permanency review hearing[,] the mental health evaluator, Dr. Patricia Pepe, testified that, notwithstanding their "faking good" scores on the child abuse

potential inventory, neither Mother nor Father had any mental health issues.[2] Because the mental health evaluation was not helpful in determining what was necessary for J.W. to be in his parents' unsupervised care, [the trial court] ordered Mother and Father to enter into individual therapy, followed by couples therapy, with the hope that either party would be more forthcoming once he or she is protected by confidentiality. Thereafter, couples therapy could perhaps be more productive.

_____

[2] Dr. Pepe also indicated that the parents told her that [the trial court] had concluded that the injury which resulted in the current dependency adjudication was "accidental." [The trial court] made no such finding. [The trial court] simply noted that the medical evidence alone (without consideration of the history or the parents' conduct) would not provide clear and convincing evidence of dependency.

Trial Court Opinion, 10/30/15, at 1-2 (unpaginated; footnote omitted; footnote in original).[2]

On July 16, 2015, Mother and Father timely filed notices of appeal, along with concise statements, pursuant to Pa.R.A.P. 1925(a)(2)(i) from the trial court's June 16, 2015 order at Docket Nos. 1446 WDA 2015 and 1450 WDA 2015, respectively. On September 21, 2015, Mother and Father timely filed notices of appeal, along with concise statements, pursuant to Pa.R.A.P.

_____

[2] The August 21, 2015 order permitted Child to be placed with his parents, as long as the maternal grandparents or paternal grandparents supervised the contact between the parents and Child. Further, the order directed that the parents would have separate counselors.

J-A10012-16
J-A10013-16

1925(a)(2)(i) from the trial court's August 21, 2015 orders, at Docket Nos.

1779 and 1780, respectively.[3]

Mother's Appeals at Docket Nos. 1079 WDA 2015 and 1446 WDA 2015

In her brief on appeal, Mother raises the following issues.

I. Whether the trial court committed an error of law or abused its discretion by making an adjudication of dependency with regard to the minor child, J.W., when the adjudication was not supported by clear and convincing evidence, as the trial court based its finding upon an unspecified harm that could occur in the future, despite evidence showing that J.W. received proper care at all times?

II. Whether the trial court committed an error of law or abused its discretion in finding that J.W. was without proper parental care or control when it based its dependency upon information from a past dependency case involving J.W., even though [Mother] was providing proper care for J.W. at the time the current action was filed?

III. Whether the trial court committed an error of law or abused its discretion by making a dependency finding based on allegations that were outside of the scope of the dependency petition, and also where the Appellant [Mother] did not have advance notice of those allegations, in violation of the Appellant's [Mother's] rights to due process and fundamental fairness?

IV. Whether the trial court committed an error of law or abused its discretion when, after a permanency hearing, it found that J.W. continued to be a dependent child solely due to its concern that neither parent was forthcoming about J.W.'s unexplained injuries in a prior dependency case, even though the parents

---

[3] In an order entered on October 16, 2015, this Court, acting *sua sponte*, consolidated Mother's two appeals and Father's two appeals, and directed that Father's appeal be listed consecutively to Mother's appeals. We address both Mother's and Father's appeals in one Memorandum for ease of disposition.

satisfactorily completed all of their requirements in the current case?

V. Whether the trial court committed an error of law or abused its discretion by requiring Appellant [Mother] to participate in individual therapy and in couples therapy, in violation of Appellant [Mother's] right to privacy?

Mother's Brief, at 8-9.

Mother asserts that we should reverse the dependency finding and disposition in the June 16, 2015 adjudication and order, because CYF failed to satisfy its burden of proof by clear and convincing evidence. She alleges that the trial court committed an error of law and abused discretion by not basing its decision upon current circumstances and facts of record. Rather, the trial court relied on information from a prior closed dependency case, speculating that Child may not receive proper medical care in the future, which is contrary to the weight of the evidence. *See* Mother's Brief, at 15-16.

Mother further contends that she was deprived of due process and fundamental fairness, as she did not have sufficient notice of the allegations that the trial court used as a basis for its decision. Mother states:

> At issue in this case were the injuries sustained by the child when Mother fell down the stairs, while holding the child, on April 25, 2015. [T]he court acknowledged that the medical evidence on its own does not establish dependency, and the parents were never provided with any notice that a hypothetical failure to obtain medical care in the future, or J.W.'s unexplained injuries in the past, would be at issue in the current proceeding. The medical experts agreed that the child could have sustained his injuries as a result of Mother's fall. The trial court therefore

- 10 -

erred in basing a finding of dependency upon the speculation or possibility that the child may be denied medical care in the future, when the facts of record established that the child did in fact receive proper medical care. Such speculations cannot be used to justify a dependency finding, particularly when the finding required a state agency to intervene into the privacy of family life[,] and also deprived Child's parents of their custodial rights.

Mother's Brief, at 16.

Mother also argues that there is no evidence, in the record in this case, that shows that the parents are currently incapable of providing proper care and control to Child, which is essential to a dependency finding. Thus, Mother maintains that the trial court erred as a matter of law and abused its discretion by making a dependency finding without clear and convincing evidence of each component necessary to support the finding. Accordingly, Mother urges that this Court should reverse the June 16, 2015 adjudication and order.

Additionally, with regard to the August 21, 2015 order, Mother asserts that the trial court acknowledged that the parents had completed all of the requirements the court and CYF had imposed, which included cooperating with CYF and participating in a psychological evaluation. Nevertheless, the trial court imposed a new requirement for the parents to attend individual therapy and couples therapy, although the psychological evaluation showed that there were no mental health concerns. Mother contends that the trial court's position, that it could not close the current dependency case until the

parents acknowledged responsibility for Child's injuries, was unsupported by statutory and case law. Moreover, Mother argues that a requirement to accept responsibilities for past, unexplained injuries should not be determinative in a dependency action, particularly when the injuries in question arose during a prior dependency case and were completely unrelated to the injuries in the current case. Accordingly, Mother requests this Court to vacate the permanency review order entered on August 21, 2015. **See** Mother's Brief, at 17-18.

Father's appeal at Docket Nos. 1980 WDA 2015 and 1450 WDA 2015

Father raises the following issues.

1. Was the [t]rial [c]ourt's dependency finding against the weight of the evidence given the testimony in the case supporting the Appellant's [Father's] contention that the child's injuries were accidentally sustained in a fall?

2. Did the [t]rial [c]ourt abuse its discretion in placing undue weight on the parents' alleged failure to inform emergency department staff about their son's prior wrist fracture and reluctance to agree to a skeletal survey?

3. Did the [t]rial [c]ourt abuse its discretion in giving undue weight to the child's prior involvement with CYF?

4. Did the [t]rial [c]ourt abuse its discretion in finding that the parents did not take responsibility for the child's wrist fracture?

5. Did the [t]rial [c]ourt err in making the inconsistent findings that [Child] continues to be a dependent child and, at the same time, finding that the Parents have completed all tasks required of them and substantially complied with the Permanency Plan put into place for their family?

6. Did the [t]rial [c]ourt err in finding that the child remains a dependent when it failed to set forth specific and attainable goals for the child's Permanency Plan including failing to state the likely date on which the child's placement goals may be achieved?

7. Did the [t]rial [c]ourt err in ordering the Parents to enter into individual and couple's therapy?

8. Did the [t]rial [c]ourt err in entering a disposition contrary to the child's best interests?

Father's Brief at Docket Nos. 1080 WDA 2015 and 1450 WDA 2015, at 2-3.

Father asserts that Child broke his wrist and then CYF became involved and imposed a set of goals on the parents. He further alleges that the parents met all obligations given to them, and the case was terminated. Father states that, in April 2015, Mother fell down the stairs while holding Child and both Mother and Child were injured. Father claims that the parents promptly took Child to the pediatrician, then for x-rays, then to Children's Hospital, where staff again contacted CYF. Father argues that the trial court's findings, that the parents had not taken full responsibility for Child's previous injury, and had "nearly" prevented Child from receiving necessary medical care, are unsupported by the record.

Father states that the trial court did not find that one of the parents had abused child. Nevertheless, the trial court found Child dependent and imposed multiple conditions on the parents. Father contends that the trial court abused its discretion in making the findings and that the second adjudication of dependency is against the weight of the evidence.

J-A10012-16
J-A10013-16

Accordingly, Father requests this Court to reverse the trial court adjudication of dependency/disposition and permanency review orders entered on June 16, 2015 and August 21, 2015. *See* Father's Brief, at 6.

Our standard of review in a dependency case as follows.

> [T]he standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We review for abuse of discretion[.]

*In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (citation and quotation marks mitted).

The Juvenile Act defines a "dependent child" as

> [a] child who:

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302(1).

This Court clarified the definition of "dependent child" further.

> The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.

*In re G.T.*, 845 A.2d 870, 872 (Pa. Super. 2004) (quotation marks and citations omitted). *See also In re J.C.*, 5 A.3d 284, 289 (Pa. Super. 2010). Additionally, we note that "[t]he burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." *G.T.*, 845 A.2d at 872 (citation omitted).

> This Court has explained that
>
> a court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

*In re D.A.*, 801 A.2d 614, 617 (Pa. Super. 2002) (*en banc*).

The Juvenile Act defines "Aggravated circumstances" as including the following circumstances:

> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

42 Pa.C.S.A. § 6302(2).

The Juvenile Act defines "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious, permanent

- 15 -

disfigurement or protracted loss or impairment of the function of any bodily member or organ." 42 Pa.C.S.A. § 6302.

The Juvenile Act, in turn, defines "aggravated physical neglect" as, "Any omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." ***Id***.

Upon a determination that aggravated circumstances exist, the Juvenile Act states the following.

> **(c.1) Aggravated circumstances.—** If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as required in section 6351(e)(3) (relating to disposition of dependent child).

42 Pa.C.S.A. § 6341(c.1).

Regarding the disposition of a dependent child, subsections (e), (f), (f.1), and (g) of § 6351 of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections, the trial court is to determine the disposition that is best suited to the safety and protection and physical, mental, and moral welfare of the child.

The Juvenile Act further provides in pertinent part:

**(e) Permanency hearings.—**

- 16 -

(1) [t]he court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan in a manner appropriate to the child's age and maturity. . . .

(2) If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child has been adjudicated dependent, the court shall then determine if aggravated circumstances exist.  If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the child's parent, guardian or custodian or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as provided in paragraph (3).

* * *

42 Pa.C.S.A. § 6351(e)(1)-(2).

Section 6351(f) of the Juvenile Act prescribes the pertinent inquiry for the reviewing court:

**(f) Matters to be determined at permanency hearing.-**

At each permanency hearing, a court shall determine all of the following:

(1)    The continuing necessity for and appropriateness of the placement.

- 17 -

(2)     The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3)     The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4)     The appropriateness and feasibility of the current placement goal for the child.

(5)     The likely date by which the placement goal for the child might be achieved.

(5.1)    Whether reasonable efforts were made to finalize the permanency plan in effect.

(6)     Whether the child is safe.

(7)     If the child has been placed outside the Commonwealth, whether the placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

* * *

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

    (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

    (ii) the county agency has documented a compelling reason for determining that filing a

petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

* * *

**(f.1) Additional determination. —** Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4)  If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency

has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and wiling relative.

**(f.2) Evidence. –** Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g)** Court order.— On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

* * *

In its August 17, 2015 opinion, the trial court provided the following

discussion of Mother's and Father's issues:

Mother's and Father's first three issues on appeal concern [the trial court's] finding that both parents have failed to acknowledge responsibility for the child's previous injuries that led to the February, 2014 dependency finding. Therefore, it is necessary to address the issue of the previous dependency adjudication and the responses thereto.

At the outset[,] it must be recognized that the previous dependency finding in 2014 was based on the fact that J.W. sustained injuries that could not have resulted without the knowledge of an adult. Thus, while [the court] did not make the specific finding that J.W. was the victim of inflicted abuse by an identified perpetrator, [the court] certainly found the parents to be responsible for these injuries.[6] My ruling at that time contemplated a situation where these[ ] injuries to the child

- 20 -

were the result of some type of accident within the knowledge of one of the parents. This failure of the parents to take responsibility for the prior injuries became a significant issue in the current adjudication, where J.W. sustained two additional fractures, as noted in the adjudicatory order of June 16, 2015.

These injuries cannot be considered in a vacuum. Appellate cases have upheld adjudications solely based upon prognostic evidence. *See In re E.B.*, 83 A.2d 426, 433 (Pa. Super. 2013) (holding, "it is well-settled that 'a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." (citing *In re R.W.J.*, 826 A.2d 10, 14 (Pa. Super. 2003))) [sic]. Certainly, in this case, where this previously dependent young child has suffered two additional fractures, the continued insistence of the parents that they are not responsible for the first incident establishes dependency by clear and convincing evidence.[7]

Furthermore, this failure to take responsibility for the prior injuries has had an effect on J.W.'s medical treatment. Upon learning from Dr. Kramer that J.W. would need to be taken to Children's Hospital to see a pediatric orthopedic surgeon, Mother and Father appeared to be less concerned with J.W.'s safety and more preoccupied with whether he would be removed from their care. Despite just learning that their son had suffered a tibia fracture, Mother and Father expressed their aversion to taking the child to Children's Hospital, only choosing to do so after being informed that it was the only place that the minor child would receive the necessary treatment for a broken bone on a Saturday. *See* Testimony of Transcript, ("T.T"), dated June 16, 2015, at 93.

Moreover, once arriving at Children's Hospital, Mother and Father demonstrated further reluctance to have J.W. appropriately treated by initially refusing to allow the medical staff to perform a skeletal survey. Although the 2014 skeletal survey revealed a radial fracture of which the parents were unaware, both Mother and Father did not want the hospital staff to perform a skeletal survey, as they believed it was solely based on the prior allegations of abuse. *Id*. at 122. The parents' objection to the skeletal survey demonstrates a lack of responsibility for the safety of their son[,] and shows that

Mother and Father were more worried that they "were going down the same path" and that J.W. "would be taken from them again." *Id*. at 144, 152. Yet, were it not for the most recent skeletal survey, J.W.'s second radial fracture would not have been discovered or treated.

The testimony of the emergency room physician, Dr. Farrell, demonstrates that Mother and Father were not forthcoming with information about J.W.'s previous injuries, which were relevant to his most recent treatment. Although both the orthopedic resident and physician's assistant questioned Mother and Father regarding J.W.'s previous medical history, Mother and Father did not disclose his previous fracture or bruises. Only after learning that the treating physicians wanted to complete a skeletal [scan] did Mother and Father disclose the minor child's previous injuries. *See* Testimony of Transcript ("T.T."), dated June 16, 2015, at 53. Were it not for the information provided to Dr. Farrell by Dr. Kramer and Dr. Wolford, the skeletal survey, which revealed the second radial fracture, may not have been conducted.

Moreover, the orthopedic surgeon, Dr. Ward, testified that the parents' failure to (1) provide a complete medical history for the minor child and (2) accurately represent CYF's past involvement with the family caused him to prematurely conclude that J.W.'s injuries were not indicative of abuse. Dr. Ward testified that Mother and Father never informed him of the previous bruises that J.W. sustained. Additionally, Dr. Ward stated that Mother and Father implied that their previous involvement with CYF was "brief" and "quickly set," which it most certainly was not. *Id*. at 21. Even if Mother and Father did not explicitly state that their involvement with CYF was brief, their failure to adequately characterize CYF's involvement in 2014 caused Dr. Ward to prematurely render a medical opinion that J.W.'s injuries were attributable to the accidental falling. Although initially believing the child's injuries to be unusual, Dr. Ward's medical opinion was swayed due to the incomplete and partially inaccurate medical history that Mother and Father provided

Therefore, it is clear that in refusing to provide both Dr. Farrell, the emergency room physician, and Dr. Ward, the orthopedic surgeon, with a complete medical and factual history

regarding J.W.'s previous injuries, Mother and Father demonstrated not only their inability to accept responsibility for the his [sic] prior injuries, as discussed *supra*, but also, their current inability to provide J.W. with adequate care or control. The parents' reluctance in cooperating with the medical professionals at Children's Hospital would not be so alarming if their reluctance did not pose a danger to the child's physical health. [The trial court] cannot overlook the fact that Mother and Father's lack of candor could have thwarted the very treatment that led to the discovery of an additional fracture.

In the concise statements, Mother and Father mischaracterize [the trial court's] prior adjudicatory findings. [The court] must emphasize that the absence of a finding of abuse in the first dependency hearing does not in itself establish a finding that no abuse took place. [The trial court's] previous dependency finding did not hinge on whether or not Mother or Father inflicted the trauma, but on the fact that the child sustained trauma, which the medical evidence confirmed could have not have [sic] resulted without an adult's knowledge. The record of the February 2014 adjudicatory hearing reflects [the trial court's] finding that a child of that age is not in a position to cause the injuries he sustained[,] and that some adult had knowledge of how J.W. sustained his injuries. Although [the trial court] did not identify a perpetrator or state that the minor child had been abused, [the court] did not make an alternative finding that the trauma was not inflicted. Therefore, the parents' arguments that [the court] made a finding that J.W. was not abused are unsupported by the record.

The [trial court] further noted that the fact that the previous dependency case was closed after Mother and Father met all of their goals is not indicative of the parents' acknowledgement of responsibility for the minor child's prior injuries. As stated in [the trial court's] June 16, 2015 findings of fact, it is the parents' most recent conduct with respect to the prior incident that demonstrates their failure to accept responsibility for the accuracy of the prior finding. At most, Mother's and Father's completion of their previous dependency goals demonstrates a propensity to cooperate with court orders; it does not, however, demonstrate their acceptance of the accuracy of the prior finding, or their willingness to accept responsibility for J.W.'s prior injuries.[8]

The parents' [next] issue on appeal avers that [the trial court] erred and abused [its] discretion in adjudicating the child dependent where the medical evidence on its own does not establish dependency and there was no evidence that parent failed to obtain proper medical attention for J.W. With respect to the parents' first argument, [the trial court] did not base [its] findings or the dependency adjudication solely on the medical evidence. As noted, [the medical evidence] is *concerning*, but alone does not establish clear and convincing evidence. What [the trial court] did find, by clear and convincing evidence, was that it became evident in this adjudication that the parents failed to acknowledge responsibility for the prior injuries, and[,] therefore, J.W. is at risk for medical professionals not receiving all of the information necessary to treat him and to assess whether he is in danger. There is ample evidence in the record that Mother and Father were not candid or forthcoming with information regarding the child's previous history. Multiple witnesses, including Mother and Father, testified to the parents' reluctance to not only have the minor child treated at Children's Hospital, but also to submit to the skeletal survey, without which the second fracture would not have been discovered. Therefore, the parents' arguments with respect to [this] issue on appeal should be dismissed.

_____

[6] While the parents cooperated with services and did what was asked of them by CYF, resulting in the closure of the prior case closed [sic] after approximately eight months, it is clear that the parents never acknowledged responsibility for the injury.

[7] As stated in [the trial court's] adjudicatory order, [the trial court], as well as other professionals in this case, very well may have been influenced by the fact that the parents appear to be such nice, respectable people who have a nice home and plenty of resources.

[8] In retrospect, the case should not have been closed without such an acknowledgement.

Trial Court Opinion, 8/17/16, at 7-12 (unpaginated; footnotes and emphasis in original).

- 24 -

In the October 30, 2015 opinion, the trial court explained:

Both Mother and Father appeal [the] August 21, 2015 Order of Court.[1]

* * *

In their concise statements, Mother and Father both assert 9 matters complained of, which can be grouped into three basic issues, specifically:

1. That [the trial court] committed an error of law and an abuse of discretion in finding that J.W. continues to be dependent because parents were not forthcoming about what happened to this child when he was an infant, despite the parents' substantial compliance with the permanency plan. **See** Mother's and Father's Concise Statement of Matters, at paragraphs 1, 2, 3, 6 and 8.

2. That [the trial court] committed an error of law and an abuse of discretion in failing to set forth appropriate goals for J.W.'s permanency plan or a likely date on which the permanency goals maybe achieved. **See** Mother's and Father's Concise Statement of Matters, at paragraphs 4 and 5.

3. That [the trial court] committed an error of law and an abuse of discretion in ordering the parents to attend both individual therapy and ultimately couples therapy, and requiring the parents' contact with J.W. to continue to be supervised at all times by either the paternal grandparents or maternal grandparents. **See** Mother's and Father's Concise Statement of Matters, at paragraphs 7 and 9.

Ultimately, Mother's and Father's issues on appeal, (which are not addressed in the Opinion in support of the adjudication) (August, 17, 2014) stem from [the trial court's] finding that J.W. continues to be a dependent child despite the fact that both parents have substantially complied with the permanency plan. However, compliance with the permanency plan does not equal progress. The mental health evaluations were ordered in order to assess whether a mental health issue was the reason why the

parents were unwilling to acknowledge their responsibility for the injuries to the child as an infant and their resulting reluctance to cooperate with medical providers, with respect to the recent fractures. Had the mental health evaluations revealed a mental health condition, which caused the parents to place the child at risk, then appropriate mental health goals could be identified so that this condition could be addressed.

Both parents deny responsibility for J.W.'s injuries as an infant, despite [the trial court's] finding that an adult was aware of the cause of the injuries. Instead, there appears to be a "circling of the wagons" or a "conspiracy of silence." *See In Re L.Z.*, 111 A.3d 1164 (Pa. 2015). Dr. Pepe's testimony that the parents do not have mental health issues may have ruled out one potential explanation as to why the parents have been unable to address the circumstances that led to the dependency adjudication.

However, without an explanation for the parents' behavior, the conditions cannot be remedied[,] and J.W. cannot safely be placed in the parents['] care without supervision. As a result, [the trial court] ordered both parents to seek individual counseling with the hope that either Mother or Father will be forthcoming with information regarding the circumstances of J.W.'s previous injuries, so that the parents may then work towards remedying the conditions that led to the most recent dependency adjudication.

For the foregoing reasons, the August 21, 2015 Order of Court should be affirmed.

_____

[1] Currently pending before the Court are Mother's and Father's appeals of the June 16, 2015 dependency adjudication at docket numbers at 1079 WDA 2015 and 1080 WDA 2015. As the present matter has been consolidated with the pending appeals, this opinion will only address facts and issues which were not addressed in the prior opinion. For more detail, see the Trial Court Opinion, dated August 17, 2015.

Trial Court Opinion, 10/30/15, at 2-4 (footnote in original).

In ***In re L.Z.***, our Supreme Court considered the question of whether this Court, sitting *en banc*, improperly reversed the determination of the trial court that the child at issue suffered child abuse, and, through the application of the presumption of *prima facie* evidence of abuse set forth at 23 Pa.C.S.A. § 6381(d), that the abuse was perpetrated by his mother.

There, a twenty-month-old male infant was brought to an emergency room by his mother and his maternal aunt, to be treated for a deep cut nearly halfway around the base of his penis. The physicians at the hospital noted bruising to the child's cheeks, severe diaper rash, and a yeast infection on the front of his body. Both women cared for the child together. The physicians suspected child abuse, as the women's explanations for the injuries to the child were consistent with abuse, and the injuries were inconsistent with the women's explanations. The physicians also suspected that the injuries were non-accidental.

The physician who treated the child at the hospital testified at the dependency adjudication hearing as an expert in pediatric medicine. When the doctor was asked whether the dark bruising to child's cheeks would "cause a child severe pain," she responded, "I am sure it couldn't have been very comfortable." 111 A.3d at 1168. The doctor testified that the injuries (the penile laceration, cheek bruises and diaper rash/yeast infection) were "consistent with a pattern of suspected child abuse," and that the child was a "victim of child abuse." ***Id***.

The trial court found that the child was a victim of child abuse as defined at 23 Pa.C.S.A. § 6303, and that the mother was the perpetrator of the abuse. *See* 111 A.3d at 1168-1169. The court transferred temporary legal custody of the child to the county agency, and placed the child in his maternal grandfather's physical custody, with his parents receiving supervised weekly visitation. The trial court also entered an order finding that aggravated circumstances existed because the child was "the victim of physical abuse resulting in serious bodily injury, sexual violence, or aggravated neglect by the parent; proven as to Mother." *Id*. at at 1169. The trial court concluded that the county agency did not need to make further efforts to reunify the child with his mother.

The mother filed an appeal to this Court. Sitting *en banc*, the majority of the Court affirmed the dependency adjudication but vacated the abuse determination. The dissent, authored by this jurist, and joined by Judge Bender and then-Judge, now Justice, Wecht, took the position that the majority improperly limited the evidentiary presumption of § 6381(d) to find *prima facie* evidence of an abuser's identity only when the abuser was proven to be present at the time of the injuries. *See id*. at 1171.

The guardian *ad litem* filed an appeal with our Supreme Court, which held that the presumption set forth in § 6381(d) was applicable to the case, and that the mother offered no testimony to rebut it. *See id*. at 1186. The Court concluded that the trial court properly found that the mother

perpetrated the abuse on the child either by inflicting the injuries, or by failing to protect the child from his maternal aunt. Accordingly, the Supreme Court reversed this Court's *en banc* decision, and reinstated the trial court's order. *See id*.

The Supreme Court stated:

> [C]hild abuse cases often involve a child presenting to a hospital with significant injuries that are entirely consistent with common types of child abuse and entirely inconsistent with the implausible explanations concocted by the parents and responsible persons to avoid allegations of child abuse. As noted, in cases where multiple caregivers are involved, the individuals frequently "circle the wagons" or alternatively point fingers at each other. As the children may be too young or fearful to describe the abuse, CYS agencies are left to prove their case with only the physical evidence of injuries that would not ordinarily be sustained but for the action of the parents or responsible persons and the implausible statements of the parents and responsible persons. Thus, while they can prove the existence of abuse rather easily, they have no ability to assign responsibility for the heinous act among the responsible adults. As Judge Tamilia observed in 1993, "the Legislature deemed it wise and necessary to establish a different evidentiary standard" by enacting Section 6381's(d)'s presumption to avoid this evidentiary conundrum and protect children from future abuse. [***In the Interest of J.R.W.***, 631 A.2d 1019, 1023 (Pa. Super. 1993)]. . . . We emphasize that, when a child is in the care of multiple parents or other persons responsible for care, those individuals are accountable for the care and protection of the child whether they actually inflicted the injury or failed in their duty to protect the child.
>
> Moreover, the Legislature balanced the presumption of Section 6381(d) by making it rebuttable as it merely establishes "*prima facie* evidence" that the parent perpetrated the abuse. 23 Pa.C.S. § 6381(d). As commonly understood, *prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not

rebutted or contradicted, will remain sufficient." Black's Law Dictionary 825 (6th ed. Abridged 1991). Accordingly, evidence that a child suffered injury that would not ordinarily be sustained but for acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption. The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

Applying Section 6381(d) as set forth above to the case at bar, we affirm the trial court's determination that [the mother] perpetrated the abuse in the form of the laceration, the cheek bruising, and the severe diaper rash and yeast infection. First, because the medical evidence presented by [the agency] demonstrated that [the child's] injuries were neither accidental nor self-inflicted and because [the child] was only in the care of [his mother and aunt], the injuries were shown to be "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child[.]" 23 Pa.C.S. § 6381(d). Ergo, either [the aunt or mother] or both inflicted the abuse [the child] suffered or failed to protect him from the other's abuse. [The mother] failed to rebut the presumption by presenting evidence or testimony from her, [the aunt] or her boyfriend establishing that [the child] was not in her care when the injuries were suffered and that she had no reason to question her decision to leave [the child] in [his aunt's] care. Likewise, neither [the aunt] nor anyone on her behalf testified. [The mother and aunt's] self-serving claims made at the hospital were neither under oath nor subject to cross-examination. They were outside-the-record and do not constitute rebuttal evidence.[25]

Instead, ample, uncontested, unrebutted evidence existed for the trial court to presume that [the mother] perpetrated the abuse on [the child]. . . .

- 30 -

Additionally, the trial court did not abuse its discretion in discrediting [the mother's] implausible out-of-court explanation and instead crediting the treating doctor's testimonial determination that the cheek bruising was classic child abuse. The court found Dr. Silver credible given the pattern of bruises showing that someone squeezed [the child's] face between her thumb and fingers, bruising which could have occurred during the window of time [the mother] acknowledged having control of [the child] and bruising that the doctor testified would have cause [the child] severe pain. Moreover, even assuming [the mother] did not inflict the penile laceration or the cheek bruising, she is still responsible for [the child's] injuries by failing to protect him from [the aunt], absent rebuttal from [the mother] that she had no reason to fear leaving [the child] with [the aunt].

We conclude that the presumption of Section 6381(d) is applicable to this case and that [the mother] offered no testimony to rebut it. Thus, the trial court properly found [the mother] perpetrated the abuse on [the child] either by inflicting the injuries or failing to protect [the child] from [the aunt].

_____

[25] Moreover, we would not fault a trial court for failing to credit any explanations that would have been given considering the implausibility of the other assertions provided at the hospital regarding [the child's] injuries.

*Id*. at 1185-1186 (footnote in original; footnote omitted).

Multiple caretaker child abuse situations are rife with credibility determinations for the trial court, and call for the trial court to make credibility determinations as to the plausible and implausible explanations for the child's injuries. **See id**. at 1186 n.25.

After a careful review of the record in this matter, we find the trial court's credibility findings are supported by competent evidence in the record. **See In re R.J.T.**, 9 A.3d at 1190. We also find no deprivation of

- 31 -

Mother's and Father's constitutional guarantees to due process of law, for the reasons expressed by the trial court in its opinion, quoted above. We find no error of law or abuse of the trial court's discretion in ordering, in the August 21, 2015 order, the parties to undergo individual and couples therapy, after the psychological evaluation, in order to reach a determination of the identity of the perpetrator of the abuse on Child. We, therefore, find Mother's and Father's appeals lack merit. Accordingly, we affirm the June 16, 2015 and August 21, 2015 orders of the trial court.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/2/2016

- 32 -