J-S24001-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: J.F., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 766 EDA 2022 |

Appeal from the Order Entered March 9, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0001278-2020

BEFORE:   PANELLA, P.J., LAZARUS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PANELLA, P.J.:            **FILED SEPTEMBER 2, 2022**

J.F. ("Mother") appeals from the Philadelphia County Court of Common Pleas' order adjudicating J.F. ("Child") dependent and committing Child to the custody of the Department of Human Services ("DHS"). Mother's counsel filed a brief pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and an application to withdraw from representation. We grant counsel's application, and affirm the orphans' court's order.

Mother has seven children, including Child, who is younger than two of her siblings and older than the remaining siblings. DHS has been involved with the family since 2019, when Child was ten years old. At that time, DHS received a General Protective Services ("GPS") report that Mother had tested

_____

[*] Retired Senior Judge assigned to the Superior Court.

positive for marijuana just before giving birth to Child's younger sibling in September 2019. Mother lived with her paramour after the birth of this child, and DHS visited Mother at the residence. Mother told DHS she was looking for housing for her and her children.

DHS received another GPS report in August 2020 after Mother had been admitted to Temple University Hospital for in-patient mental health treatment. The catalyst for the in-patient stay was Mother jumping from a moving vehicle which had two of her children inside. The GPS report also indicated Mother had left Child and four of her siblings with their maternal grandmother ("Grandmother") for days at a time, and had been throwing away the children's clothing and food on the belief they were infested with bugs.

Although Child and several of her siblings lived with Grandmother for a period of time, Mother took Child and four of her siblings back into her care and began residing at a shelter in September 2020. However, Mother and the children left the shelter and once again began residing with Mother's paramour. DHS visited the family there, and concluded the home was inappropriate as it only had one bedroom.

In October 2020, DHS received a supplement to the GPS report alleging Mother was using drugs and could not be located, and that Grandmother was caring for Child and four of her siblings. DHS believed that Child and her siblings then left Grandmother's care and were once again residing with

Mother at Mother's paramour's home, prompting DHS to file a dependency petition for Child and the siblings.

Child and the siblings were each adjudicated dependent on March 24, 2021. The court ordered that legal and physical custody of Child remain with Mother, but DHS was to supervise Mother's home. After a permanency review hearing in September 2021, the court discharged the dependency petitions and DHS supervision as to Child and one other sibling, but ordered DHS supervision to continue for three of the still-dependent siblings in the home.

Child absconded from Mother's home in January 2022, and began living with Ernest Allen, who Child had been told by Mother was her father. The Community Umbrella Agency ("CUA") visited Allen's home, and Allen and his mother identified Allen as Child's father. In February 2022, CUA learned Allen was a registered sex offender. Mother could not be reached, so CUA went to Child's school. Child stated she refused to live with Mother, and DHS obtained an order of protective custody ("OPC") and placed Child with a kinship resource.

DHS received another supplemental GPS report a few days later in February 2022, alleging Mother had been diagnosed with schizophrenia, had threatened to kill Allen and had a gun license, and was denying CUA access to

her home. DHS filed another dependency petition for Child, and an adjudication hearing was held on March 9, 2022.[1]

Counsel for DHS began the adjudicatory hearing by informing the court that it was her understanding that "counsel [for Mother] is in agreement to adjudicate the child dependent based on present inability. And I would just be asking to – with a full commit to DHS, to have CUA testify to the allegations." *Id.* at 11. Counsel for Mother responded that he would stipulate. *See id.* Counsel also agreed there was a "stipulation to the facts [in the dependency petition], not to the veracity in the petition." *Id.*

Counsel for DHS proceeded to call Breona Palmer, the CUA case manager supervisor, to testify. Palmer testified that she had been supervising Mother and the children since the CUA had been assigned to their case in August or September 2020. She testified that even though Child had been discharged from supervision in September 2021, Child's younger siblings remained under DHS supervision and Palmer was therefore still obligated to see all the children in Mother's home, including Child. *See id.* at 14. In fact, when the orphans' court discharged Child, the court stated that Child was old enough to communicate any concerns to CUA, who was still supervising the younger siblings. *See id.* at 32.

_____

[1] Allen was at the hearing but had failed to take the previously-ordered paternity test, and was still refusing to take a paternity test. *See* N.T., 3/9/22, at 10. The court therefore dismissed Allen before the hearing began.

Palmer recounted that she reached out to Mother on January 13, 2022, to schedule a visit with Child. Mother told Palmer that Child, who was then 12 years old, had left the home approximately five days ago, and Mother did not know where Child had gone. *See id.* at 15-16. Palmer went to Mother's house and Palmer was able to speak briefly with Child on her cell phone. Child told Palmer she was safe but hung up when asked about her whereabouts.

Palmer asked Mother about Allen, whose name had been given to Palmer by Grandmother, and Mother told Palmer that Allen was Child's father. *See id.* at 19. Palmer spoke with Allen on the phone, who stated he was Child's father, and that he had seen Child but she was no longer at his house. *See id.* at 18. Palmer learned a few days later that Child had returned to Allen's house, and Palmer did a home assessment of Allen's house on January 19, 2022. *See id.* at 20.

When Palmer told Mother that Child was at Allen's house, Mother became upset and now claimed that Allen was actually not Child's father. Mother declined to retrieve Child from Allen's house or call the police. *See id.* at 21-22. Palmer testified she felt it was appropriate to leave Child at Allen's house while she waited for his clearances, given that Child, Allen, Allen's mother, and initially Mother, had all told her Allen was Child's father. *See id.* at 22-23.

Palmer testified that on February 2, 2022, she learned from the clearance process that Allen was a registered sex offender, and that he was

not named on Child's birth certificate. *See id.* at 23. Palmer was unable to contact Mother. *See id.* at 24-25. As a result, Palmer went to Child's school, and spoke with Child. Child told Palmer she left Mother's house because she had been overwhelmed by having to care for her younger siblings, take the school-aged children to school, and cook for the family. *See id.* at 26-27. Child also indicated that she had been truant while living at Mother's house as Mother did not allow the children to leave the house for any reason on some days. *See id.* at 29-30. Child told Palmer she did not want to live with Mother. *See id.* at 27, 31. As noted above, Palmer obtained an OPC and placed Child with a kinship resource, and DHS filed the second dependency petition for Child.

Palmer also testified there were times that Mother denied CUA access to her home, requiring police intervention, and at other times, Mother would not allow CUA to speak with the children privately. *See id.* at 33-34. On one visit, Mother only allowed one child to come to the door at a time to speak with the caseworker, and Mother stood behind the door. *See id.* at 36-37. Palmer testified Child was overdue for a dental examination, which Mother was aware of but had not addressed. *See id.* at 30-31, 51. Palmer continued to have concerns about Mother's escalating paranoia and anger, her anger management and her mental health. *See id.* at 34, 36.

Mother also testified. She maintained that she wanted to have Child home with her, primarily because she was her daughter. *See id.* at 45-46.

She claimed she never told Palmer that Allen was Child's father, and stated that she did not trust Palmer. *See id.* at 46, 47. She also claimed that she had notified the police after Child left her house in January 2022. *See id.* at 49.

Following this testimony, the orphans' court granted DHS's petition, adjudicated Child dependent, and committed Child to the custody of DHS. Mother was given supervised visitation at Child's discretion. Mother's counsel filed a notice of appeal. Counsel then filed an *Anders* brief and identified two issues Mother wished to raise on appeal:

> 1. Whether the [orphans'] court committed reversible error, when it adjudicated the minor child, J.F.[, d]ependent, where such a determination was not supported by clear and convincing evidence under the Pennsylvania Juvenile Act, 42 Pa. C.S.A. §§ 6301-6365.
>
> 2. Whether the [orphans'] court committed reversible error, when it committed the minor child, J.F.[,] to [DHS], where such determination was not supported by clear and convincing evidence under the Pennsylvania Juvenile Act, 42 Pa. C.S.A. §§ 6301-6365.

*Anders* Brief at 6.

Counsel reviewed each of the issues in his brief, and concluded that both issues were meritless. He asserted there were no other non-frivolous issues to appeal, and therefore, filed an application to withdraw from representation

along with his **Anders** brief.[2] As a threshold matter, we have reviewed counsel's brief and application and conclude that they meet the requirements set forth for counsel seeking to withdraw from representation on direct appeal. **See Commonwealth v. Orellana**, 86 A.3d 877, 879-880 (Pa. Super. 2014).[3] Accordingly, we turn to our own review of the appeal to determine if it is wholly frivolous. **See Commonwealth v. Wrecks,** 931 A.2d 717, 721 (Pa. Super. 2007) (stating that once this Court determines that counsel's application and brief satisfy **Anders**, the Court must then conduct its own review of the appeal to determine if it is wholly frivolous).

In doing so, we agree with the orphans' court and Mother's counsel that the orphans' court did not abuse its discretion by adjudicating Child dependent. **See In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010) (stating that appellate courts review dependency determinations for an abuse of discretion). In the first place, any challenge to the dependency determination

_____

[2] We note that neither Child's counsel nor DHS filed an appellate brief in this matter because of Mother's counsel's concession that the appeal is wholly frivolous.

[3] Specifically, counsel seeking to withdraw from representation on direct appeal under **Anders** must file a brief that: 1) provides a summary of the procedural history and facts; 2) refers to anything in the record that counsel believes arguably supports the appeal; and 3) sets forth counsel's conclusions that the appeal is frivolous, and the reasons for that conclusion. **See id.** Counsel must also provide a copy of the **Anders** brief to his client, with an accompanying letter that advises the client of his right to: 1) retain new counsel to pursue the appeal; 2) proceed _pro se_; or 3) raise additional points deemed worthy of the Court's attention. **See id.** at 880. Counsel for Mother substantially complied with these requirements here.

is waived on appeal, given that Mother's counsel stipulated that Child was a dependent child at the dependency hearing. **See** N.T., 3/9/22, at 11; Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Even if the issue was not waived, we also agree with the orphans' court and Mother's counsel that DHS nonetheless presented clear and convincing evidence that Child was a dependent child. **See in re G., T.,** 845 A.2d 870, 872 (Pa. Super. 2004) (stating that the burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child is dependent).

The Juvenile Act governs dependency matters and defines a "dependent child" as one "without proper parental care or control, subsistence, education as required by law or other care or control necessary for [the child's] physical, mental or emotional health, or morals." 42 Pa.C.S.A. § 6302. "Proper parental care" is care that is geared towards the particularized needs of the child and, at a minimum, is likely to prevent serious injury to the child. **See In re A.B.**, 63 A.3d 345, 349 (Pa. Super. 2013). However, abuse is not essential for a finding of dependency but, rather, the primary consideration is the ability and willingness of a parent to provide the necessary and proper care for a child's particular needs. **See Matter of Yeager,** 455 A.2d 717, 719 (Pa. Super. 1983). "[W]hen determining whether a parent is providing a minor with proper care and control … the caretaker's acts and omissions should weigh equally."

*In re R.W.J.*, 826 A.2d 10, 14 (Pa. Super. 2003) (citation omitted) (ellipsis in original).

Here, in finding that it had properly adjudicated Child dependent, the orphans' court stated at the outset that it found the testimony of "Palmer to be highly credible while Mother lacked credibility." Trial Court Opinion, 4/26/22, at 8; *see R.J.T.*, 9 A.3d at 1190 (providing that in dependency adjudications, an appellate court defers to the trial court's credibility determinations as long as they are supported by the record). The court also found that Palmer's credible testimony supported a finding that Child was a dependent child.

The court noted Palmer testified that although Child was discharged from her initial dependency in September 2021, the discharge was done on the understanding Child could communicate any concerns to CUA since CUA was still supervising other children in Mother's home. However, Palmer also testified that Mother denied CUA access to her home at times, and CUA had difficulty speaking to Child in private. The court further explained Palmer's testimony and the reasons for its dependency adjudication:

> Despite CUA's involvement, Mother failed to notify CUA that Child had been missing from her home for five days. It took [ ] Palmer's attempts to schedule a home visit for Mother to even mention Child was missing. Despite Mother's testimony that she contacted the police to file a 'missing report' (N.T., 3/9/22, [at] 49), the Court did not find Mother credible in her account.

> Furthermore, Mother made virtually no effort in locating or retrieving Child once her location was identified, instead passing responsibility to CUA. … Mother was also passing her own parental

- 10 -

duties in the home onto Child, which directly led to Child feeling overwhelmed and fleeing Mother's home. This form of parentification, in making a twelve-year-old child responsible for taking younger siblings to school and cooking the family's meals, in addition to preventing them from leaving the home to attend school, raises issues sufficient for a finding of dependency.

Child lacked proper parental care and control while in Mother's home. This is demonstrated by the fact [ ] Child was overdue for her dental examination, was relied on to care for her younger siblings, and was truant from school [when Mother prevented her from leaving the house]. Mother's conduct placed Child's emotional and developmental welfare at risk.

Trial Court Opinion, 4/26/22, at 11-12.

We see no abuse of discretion in the orphans' court's conclusion that DHS presented clear and convincing evidence that Child lacked proper parental care and was dependent. Therefore, we agree with Mother's counsel that this first issue, even if not waived, lacks merit.

The second issue forwarded by counsel in his **Anders** brief relates to whether the orphans' court abused its discretion by committing Child to the custody of DHS. We agree with Mother's counsel that it did not.

After a court finds a child is dependent, it must then order an appropriate disposition for the child. This disposition must be "best suited to the safety, protection and physical, mental, and moral welfare of the child." 42 Pa.C.S.A. § 6351(a). A court can only remove a child from the care of her parents when it is clearly necessary, that is, where the "welfare of the child demands" it, **in re G., T.,** 845 A.2d at 873 (citation omitted), and after

reasonable efforts were made to prevent that removal, *see* 42 Pa.C.S.A. § 6351(b)(2).

Here, in finding that Child's placement in DHS's custody was clearly necessary, the court reinforced that Mother repeatedly failed to comply with CUA's requests for safety assessments and at times did not allow CUA to speak with the children privately. The court further pointed out that Mother failed to inform CUA that Child had been missing from her home for five days, and did not express any urgency about her whereabouts or safety. The court continued:

> Despite CUA's assistance available to Mother, Child became truant, overdue for her dental examination, and Mother's parental duties fell upon Child's shoulders. DHS, through CUA, had attempted to work with Mother to prevent further need for court involvement, let alone placement of Child, and the trial court found reasonable efforts were made to prevent such a placement. However, Mother's failure to perform parental duties, her unwillingness to cooperate with CUA, and lack of attention to Child's needs necessitated Child's removal from Mother's care and a commitment to DHS. The trial court did not abuse its discretion when it removed Child from Mother and allowed her to remain in kinship care.

Trial Court Opinion, 4/26/22, at 13.

Again, we discern no abuse of discretion in the orphans' court conclusion that Child's placement with DHS was clearly "necessary and appropriate for her safety and well-being." ***Id***.; ***see also In re A.B.***, 63 A.3d at 350 (stating it is "not for this [C]ourt, but for the trial court as fact finder, to determine whether [a child's] removal from her family was clearly necessary") (citation omitted) (brackets in original).

- 12 -

We therefore agree with Mother's counsel that the two issues raised in the **Anders** brief are without merit. We have reviewed the record and the appeal and do not see any other claims that are non-frivolous. Accordingly, we grant counsel's application to withdraw and affirm the orphans' court order adjudicating Child dependent and placing her in DHS's custody.

Application to withdraw granted. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/2/2022